19205

The STATE, Respondent, v. Marion LAGERQUIST, *et. al.*, Appellants.

(180 S. E. (2d) 882)

*Messrs. Wesley M. Walker, Hoke Smith, Herman E. Cox,* and *Ernest J. Howard,* of Greenville, *for Appellants,*

*Messrs. Daniel R. McLeod, Atty. Gen., Joel E. Gottlieb, Asst. Atty. Gen.,* of Columbia, and *B. O. Thomason, Jr., Esq., Solicitor,* of Greenville, *for Respondent,*

April 14, 1971.

LITTLEJOHN, Justice:

The eleven appellants were found guilty of criminal conspiracy to unlawfully obtain insurance dividend funds in violation of code sections 16-366, 37-251 and 37-253. We affirm the convictions.

Some years prior to 1965 the Francis Marion Life Insurance Company operated in South Carolina. It sold a "coupon" type of life insurance policy, under the terms of which a portion of the premium was applied for insurance coverage and the remainder was placed in savings account fund belonging to the owner of the policy. The policyholder had certain control rights over the fund, including the right of withdrawal on designated anniversary dates. Certain conversion rights were granted under the policy.

In 1961 Francis Marion Life Insurance Company was acquired by the Kennesaw Life and Accident Insurance Company through merger and stock exchange. With the merger Kennesaw took over the operations of Francis Marion and assumed liability on the outstanding policies.

In the late summer of 1965 officials of Kennesaw decided upon a plan whereby they would attempt to persuade its policyholders to convert the accumulated savings into additional life insurance prepaid for a fixed number of years. The plan was to induce the policyholders to sign over to the company the accumulated savings, for which the company would issue insurance policies. Kennesaw had no straight-life insurance salesmen in South Carolina, but had many annuity salesmen. Kennesaw decided to use these annuity salesmen for a short one-time campaign of contacting those policyholders who originally held Francis Marion policies and who had accumulated savings.

Appellants Lagerquist, Howell and Harding were officers of Kennesaw. They came to Greenville, South Carolina on or about October 18, 1965 and explained the details of the conversion plan to the other defendants, who were employees of Kennesaw.

It was at this sales meeting that the State charges all of the appellants with having conspired to defraud Francis Marion policyholders of their accumulated savings.

In addition to the three officers and eight other employees whose cases are now on appeal in this court, one other sales-

man, Henry Ingram, was also charged. He pled guilty prior to the trial. It was on the basis of Ingram's testimony, and that of twenty-one other witnesses that the appellants were found guilty.

After the defendants were convicted and sentenced the transcript of record was ordered from the official court reporter for appeal purposes. The same was not delivered to counsel for the appellants until thirty-three month later. The appellants moved before the trial court to dismiss the cases on the ground that they had been denied a speedy review and due process because of the unusual delay. The lower court refused the motion and this court affirmed. *See State v. Lagerquist et al.,* 254 S. C. 501, 176 S. E. (2d) 141 (1970). The first issue presented on this appeal for our determination was whether the lower court erred in not *sua sponte* directing the preparation and filing of the transcript of record. For the reasons set forth in our reported case we find the exception without merit.

Before the trial of the case was commenced the appellant, George Turner, moved to quash the indictment so far as it applied to him because he had been summoned before the grand jury. The motion was overruled. He alleges error on the part of the lower court in refusing to grant the motion. No factual showing was made to the lower court, or to this court, as a basis for granting the relief sought. The trial judge correctly overruled the motion.

Appellants next allege error on the part of the lower court in denying their motions for a mistrial based on newspaper publicity alleged to be prejudicial. During the trial there appeared in the Columbia Record, published about 100 miles from Greenville, and in the Anderson Daily Mail, published about 30 miles from Greenville, and in the Greenwood Index Journal, published about 50 miles from Greenville, an Associated Press story stating that the trial of the appellants was continuing. It indicated that the appellants were "charged with failing to deliver policies they

sold and pocketing the money that they received." If, by chance, this article came to the attention of any member of the jury, we do not think it could have been prejudicial. The trial lasted about nine days; the true nature of the charges were abundantly clear. The article referred to the trial then in progress, and if any member of the jury read it he could not help but detect that the writer had described the charges erroneously. The article was not of an inflammatory nature nor such as to warrant a mistrial. In addition, we take notice of the charge which the judge gave to the jury when he said:

"I emphasize to you and charge you specifically please do not listen to or read those reports for the simple reason that no matter how good a reporter is nevertheless they may emphasize a fact that you would not so these parties are entitled to have you try this case upon your impression of the evidence."

The further contention that the judge should have polled the jury to determine if they had read the articles is without merit. The duty to poll the jury presupposes a prejudicial publication. Counsel did not ask the judge to poll the jury, and we find no error in his failing to do so of his own volition.

Appellants next contend that a new trial should be granted because State's witness Henry Ingram testified that he had previously pled guilty to the same charge. The following is taken from the record:

"Q. Now, I want to ask you whether or not on Friday of last week, Mr. Ingram, you pled guilty to this criminal conspiracy?

"A. Yes, sir.

"Mr. Walker: If Your Honor please, we submit that it would [sic] appropriate to anything that he may have done for Your Honor to instruct the jury with regard to what he may have done.

"The Court: Yes, sir. Do you want the instruction now?

"Mr. Walker: Yes, sir. I would appreciate it.

"The Court: Mr. Foreman and gentlemen, it will be a basic rule and I will again charge it to you at the conclusion of this trial it is a basic rule that the action of any one person of course has no effect upon the positions of the others as they appear in Court and any action in response to the charge that this witness may have taken is not to be considered by you as affecting the positions of the others."

We are not at all sure that counsel objected to the testimony. Assuming, as now contended in appellants' brief, that objection was made, and assuming without so deciding that the question and answer were irrelevant, we think that the trial judge correctly dealt with the matter in his forthright statement and charge to the jury.

The case of *United States v. Toner,* 173 F. (2d) 140 (1948), relied on by appellants, is of no comfort to them. In that case similar facts were involved, but the error which brought about a new trial lay in the fact that the judge instructed the jury that "* * * the jury can take into consideration that one of two co-conspirators did plead guilty and make such use of it as they see fit. That is where the American common sense comes in. I won't define any further what they can do and cannot do with that kind of evidence."

Appellants also seek comfort in *Bruton v. United States,* 391 U. S. 123, 88 S. Ct. 1620, 20 L. Ed. (2d) 476 (1968); that case is inapposite to the situation presented here. In *Bruton* the co-defendant's confession was admitted into evidence through the testimony of the Federal agent to whom he had confessed. The decision turned on the constitutional right to confront witnesses. In the case at bar Ingram was on the witness stand and available for cross examination. The jurors were entitled to know who the witness was and the State was entitled to show the relationship of the witness to the parties and to the case.

After the questions and answers indicated above, the prosecuting attorney asked the witness if he had been promised anything in connection with his guilty plea. His answer (which was, "No, sir") was objected to on the ground that "It's not against these defendants, Your Honor." Thereupon the court further stated to the jury:

"Of course it's not and I have so charged the jury and asked them to keep it in mind. Anything pertaining to Mr. Ingram's own personal disposition has no connection and no relation to the other defendants."

We think that no prejudice has been shown and we hold the exception without merit.

Appellants contend finally that the lower court erred in not granting their directed verdict motion. They stress the "open and honest" nature of the regular sales meeting at which the alleged conspiracy occurred; there is little appeal to their reasoning that no conspiracy could conceivably have taken place at a meeting such as this one, or that a conspiracy, by its very nature, must be secret and clandestine.

The testimony of Ingram consumes some 190 pages in the transcript, and it is clearly inferable from his testimony that the salesmen had been instructed that in contacting the policyholders they were to conceal the fact that policyholders' own accumulated savings would be used for purchase of new policies. At page 41 of the transcript we note the following:

"Q. Now, what, if anything, did Mr. Harding and Mr. Lagerquist tell you and the other agents there with regard to this savings that had been building up in the Francis Marion policies?

"A. Well, most of the people didn't realize that they had savings in there and that it would be real easy to convert by not knowing they had it in there. We weren't to tell them it was in there unless we had to and convert it."

At page 42 of the transcript, in explaining the instructions given at the meeting, Ingram testified:

"A. Well, we were to be given a work sheet that showed us how much money had been accumulated, how much each one of them had saved up in the policy and on this work sheet it showed how much accumulated savings he had and how much insurance it would buy. And we were to go to them and tell them that we weren't very familiar with the old Francis Marion policy or anything but that some money had accumulated in the Old Francis Marion Company and we were to tell them that we didn't know very much about it and to tell them that they could take this insurance that was paid up and it wouldn't take any money out of their pocket."

At page 51 of the transcript we find the following testimony by Ingram:

"Q. What, if anything, did Mr. Harding tell you about showing this work sheet to the policyholders you were to call on.

"A. Well, we weren't to show this to the policyholders.

"Q. And why did Mr. Harding tell you, if he did, that you were not to show this worksheet to the policyholders?

"A. Well, that would more or less confuse them. They would know that they had this savings and they would probably associate their savings were going to come out to buy this insurance. And then you wouldn't be able to convert it."

In further describing that which took place at the meeting, Ingram testified:

"Q. Now, what if any instructions did they give you, you and the other agents, with regard to telling these prospects or policyholders of Francis Marion that you were converting their savings to buy this new insurance?

"A. Well, we weren't to tell them that we were actually using their savings. We were supposed to just act like we didn't know anything about it. If they asked us we were to say we weren't familiar with it that you would have to check back with the home office but if they wanted to take advantage of the insurance you had to get the things filled out now."

After the agents had sold the policyholders on the insurance program they were to get a statement of assignment from each assigning all rights in the accumulated savings to Kennesaw. Ingram testified about the assignment as follows:

"Q. All right. Now what, if anything, did Mr. Harding or Mr. Lagerquist tell you about the assignment?

"A. That it was to be signed by the insured [sic] blank * * *.

"* * *

"Q. Now, were you told or given any instructions with reference to getting the assignment signed in blank?

"A. Well, we were to tell them that the home office was real busy and hadn't had time to fill them out and that they would be filled out at the home office and mailed back to them."

The State presented witnesses who testified to overt acts on the part of each of the eight salesmen in furtherance of the agreement at the October 1965 meeting. Policyholders were brought into court to describe the sales pitch of each of the eight salesmen. The testimony of these policyholders shows that each of the eight salesmen did just what Lagerquist, Harding and Howell had instructed them to do.

The following is taken from our case of *State v. Fleming,* 243 S. C. 265, 133 S. E. (2d) 800 (1963):

"Conspiracy is defined by Section 16-550, Code of Laws 1962, as follows:

" 'The crime known to the common law as "conspiracy" is hereby defined as a combination between two or more persons for the purpose of accomplishing a criminal or unlawful object or an object neither criminal nor unlawful by criminal or unlawful means.'

"The foregoing statute is declaratory of the common law definition of conspiracy. *State v. Jacobs,* 238 S. C. 234, 119 S. E. (2d) 735, and authorities cited therein. It need not be shown that either the object or the means agreed upon is

an indictable offense in order to establish a criminal conspiracy. It is sufficient if the one or the other is unlawful. *State v. Davis,* 88 S. C. 229, 70 S. E. 811. Nor need a formal or express agreement be established. A tacit, mutual understanding, resulting in the wilful and intentional adoption of a common design by two or more persons is sufficient, provided the common purpose is to do an unlawful act either as a means or an end. 15 C. J. S. Conspiracy § 40. Although the offense of conspiracy may be complete without proof of overt acts, such 'acts may nevertheless be shown, since from them an inference may be drawn as to the existence and object of the conspiracy. It sometimes happens that the conspiracy can be proved in no other way'. *State v. Hightower,* 221 S. C. 91, 69 S. E. (2d) 363. 'To establish sufficiently the existence of the conspiracy, proof of an express agreement is not necessary, and direct evidence is not essential, but the conspiracy may be sufficiently shown by circumstantial evidence and the conduct of the parties. The circumstantial evidence and the conduct of the parties may consist of concert of action.' 15 C J. S. Conspiracy § 93a."

The evidence is susceptible of the inference that the defendants conspired together to cheat and defraud certain policyholders of their accumulated savings and dividends by misrepresentation and concealment. The issues were properly submitted to the jury, and the judgment of the lower court is

Affirmed.

· Moss, C. J., and LEWIS, BUSSEY and BRAILSFORD, JJ., concur.