# IN THE SUPREME COURT OF IOWA

No. 14–0816

Filed March 25, 2016

**STATE OF IOWA,**

    Appellee,

vs.

**THEODORE RAY GATHERCOLE II,**

    Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Linn County, Stephen B. Jackson Jr., Judge.

A defendant in a criminal case contends the district court should have granted his request to poll the jury after a local newspaper published a factually inaccurate online report about the case during trial. **COURT OF APPEALS DECISION AND DISTRICT COURT JUDGMENT AFFIRMED.**

Mark C. Smith, State Appellate Defender, and Vidhya K. Reddy, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Kevin Cmelik and Mary A. Triick, Assistant Attorneys General, Jerry Vander Sanden, County Attorney, and Nicholas Maybanks, Assistant County Attorney, for appellee.

**HECHT, Justice.**

Midtrial publicity is not a new phenomenon. *See State v. Walton*, 92 Iowa 455, 458–59, 61 N.W. 179, 180 (1894) (concluding when jurors viewed newspaper editorials about a criminal trial during their deliberations, "they meddled and interfered with the order of the court in a very reprehensible and unseemly manner"). But "in this day and age, our jurors are part of the new electronic world." *State v. Webster*, 865 N.W.2d 223, 239 (Iowa 2015). In this case, we apply precedent governing print materials to that electronic world and determine whether a factually inaccurate news story published on a local paper's website during a trial raised "serious questions of possible prejudice" requiring the district court judge to poll the jury about possible exposure to it. *State v. Bigley*, 202 N.W.2d 56, 58 (Iowa 1972).

### I. Background Facts and Proceedings.

On June 15, 2013, Frederick Rottmiller was a maintenance man at a Cedar Rapids apartment building. Rottmiller, a septuagenarian, was called to an apartment occupied by Theodore Gathercole and his ex-wife to inspect a water leak. While there, Rottmiller loaned Gathercole twenty dollars. Hours later, after midnight, Gathercole knocked on Rottmiller's apartment door and asked for more money, claiming he wished to visit someone in the hospital and needed the funds for a taxi fare. Rottmiller refused to give Gathercole more money but offered to drive him to the hospital. Gathercole accepted the ride offer and walked away from Rottmiller's door while Rottmiller retrieved his shoes and car keys.

Rottmiller soon walked to the parking lot where his truck was parked. As he approached the truck to unlock the door, Rottmiller noticed someone standing near it. Suddenly, Rottmiller was stabbed with a knife and he collapsed to the ground. Declaring repeatedly, "I'm

going to prison for this," the assailant continued the attack as Rottmiller lay on his back. The assailant fled without taking Rottmiller's wallet, cell phone, or any other property.

Later, a passerby discovered Rottmiller on the ground. The passerby summoned a taxi and prompted the driver to call 911. Police and paramedics responded to the call, and remarkably, Rottmiller survived the attack. Physicians surgically removed several inches of Rottmiller's intestine and treated other injuries including a chipped vertebra and spinal cord damage. Although he survived the attack, Rottmiller lost vision in one eye and was unable to walk for several months after the incident.

Rottmiller told an officer responding to the 911 call that "a shorter white male" had assaulted him, that he recognized the assailant, and that the assailant "lives with a female named Lorrie." Gathercole's ex-wife is named Lorrie, although Rottmiller did not expressly name Gathercole as the assailant at the time. Rottmiller later selected Gathercole from a photographic lineup of six possible suspects.

Police arrested Gathercole and charged him with attempted murder, robbery, and willful injury. Trial began on February 3, 2014. Jury selection consumed most of the first day. After empaneling the jury, the court recessed for the day and recited a lengthy jury admonition that stated, in pertinent part,

> Prior to recessing, I'm required to admonish you. While I will give this admonition to you at this time, I will not go through the entire admonition each time we recess but will merely state that you must remember this admonition which has been previously given to you, therefore, please pay particular attention to it at this time.
>
> . . . .

> You must avoid reading . . . , listening to, or watching news accounts of this trial for sometimes such accounts are based on incomplete information or contain matters which would not be admissible in court and could unduly influence your ultimate decision.
>
> . . . .
>
> As I said earlier, each time we recess I will not give this admonition in detail, merely I will just state that you must remember the admonition as it was given to you earlier.

The parties presented opening statements the next morning and began calling witnesses.

The State's principal witness, Rottmiller, testified unequivocally that Gathercole was the assailant. Gathercole's defense theory disputed identity, challenged Rottmiller's perception and memory, and emphasized the State produced no physical evidence placing Gathercole at the scene of the crime. The State acknowledged there was no physical evidence placing Gathercole at the crime scene but contended Rottmiller's unequivocal identification of Gathercole supported a finding of Gathercole's guilt beyond a reasonable doubt.

After the first day of testimony (February 4), the court reminded the jury to "stay away from any media accounts that there may be regarding this case." After the second day of testimony (February 5), the court similarly reminded the jury to "stay away from any media accounts of this case, and be mindful of all the rest of the admonition I gave to you."

On February 6, the parties presented closing statements. Again, the State focused on Rottmiller's testimony identifying Gathercole as the perpetrator. Gathercole's closing statement emphasized the lack of physical evidence connecting him to the crime scene and the possibility Rottmiller's perception and memory were impaired by trauma. The district court then instructed the jury and deliberations began.

As deliberations continued into the morning of February 7, Gathercole moved for a mistrial or, alternatively, a poll of the jurors about their possible exposure to a factually inaccurate media account of the case. While browsing the website of the Cedar Rapids Gazette (the Gazette) that morning, defense counsel had discovered an article about this case published on or last modified in the afternoon of February 5. The article's headline was "Police try to explain lack of crime scene evidence in a stabbing." The second paragraph of the article stated crime scene investigators had matched a palm print found on Rottmiller's truck to Gathercole. Additionally, a sentence near the end of the article stated the palm print was "the only piece of physical evidence that ties Gathercole to the scene." Both sentences were factually incorrect. As opening statements, trial testimony, and closing arguments established, the palm print actually matched Rottmiller—which was unsurprising because he owned the truck.

The record does not reveal how many page views the article had accrued prior to Gathercole's motion, how prominently the Gazette website featured it, or whether an internet reader could access the entire story without specifically clicking on the headline. The record also does not disclose whether the article appeared in the print version of the Gazette—and if it did, the specific section and page where the article appeared. Furthermore, the record does not tell us whether the article or its content was syndicated for distribution or actually distributed through other media platforms or publications that might have wider readership or exposure than the Gazette alone. However, the printed copy of the web page version of the article introduced into evidence shows some modest social media interaction had occurred. Three unidentified website visitors had "liked" the article on Facebook, two had

shared a link to the article on Twitter, and three had otherwise shared the article via email or social media.

Gathercole asserted the Gazette article was prejudicial because it misstated the evidence and struck at the heart of his defense: The State presented no physical evidence connecting him to the crime scene. Gathercole acknowledged the court had admonished the jury to avoid media reports but expressed concern that any juror who read or heard about the misinformation in the article might have become confused and believed they either misheard or misunderstood the evidence presented in court. He further asserted that if one or more jurors read the article, believed it, and relied on it during deliberations, such conduct deprived him of his right to a fair trial and required a mistrial. In the alternative, Gathercole asserted the possible prejudice from the article at least required a jury poll probing whether any jurors had seen the article or read the factual misstatement.

The State resisted both motions, contending there was no reason to suspect any juror had violated the court's clear admonition to avoid media reports. *See Bigley*, 202 N.W.2d at 57 (concluding the defendant received a fair trial in part because "[t]here was no reason . . . to believe jurors had violated [the] court's admonition"). The State contended the court should trust that jurors followed the court's instructions and serial admonitions. The State further cautioned that it believed the court should be very reluctant to interrupt the jury's ongoing deliberations.

The district court denied the motion for mistrial. The court agreed the article was factually inaccurate but credited several circumstances tending to prove the article had not prejudiced Gathercole. First, while the article misstated the evidence, it did not contain facts that were otherwise inadmissible—for example, evidence excluded under Iowa Rule

of Evidence 5.404(*b*). Second, the court noted, the factual misstatement appeared in the article's text, not as part of the headline. Third, no juror had approached any court staff to reveal he or she had seen or read the article. Fourth, the court had issued a stern admonition on the first day of trial and repeatedly referred to it before each day's recess—including specific reminders to avoid media accounts of the trial. Finally, the parties did not dispute that the palm print found on the truck matched Rottmiller—not Gathercole; thus, the article's misstatement did not create a risk that the jury would use the information to resolve a factual dispute in the State's favor.

The court also denied the alternative motion to poll the jury. The court expressed concern that polling the jury might perversely call attention to the issue and stated it was loath to interrupt the jury's deliberations. The court expressed willingness to reconsider or enlarge its ruling on the jury-polling question if either party filed an appropriate motion with a supplemental brief containing supportive authority. Neither party filed a supplemental motion or brief.

The jury ultimately convicted Gathercole on all three charged counts. Gathercole did not renew his motion to poll the jury after the verdict, nor did he file a motion asserting the court's refusal to poll as a ground for a new trial. At sentencing, the court merged the willful injury conviction with the robbery conviction and sentenced Gathercole to consecutive twenty-five-year terms for attempted murder and robbery. *See State v. Hickman*, 623 N.W.2d 847, 852 (Iowa 2001) (concluding willful injury and first-degree robbery must merge).

Gathercole appealed, contending the evidence was insufficient to convict him and the court should have declared a mistrial or at least polled the jury after counsel brought the factually inaccurate Gazette

article to the court's attention. We transferred the case to the court of appeals. The court of appeals affirmed Gathercole's conviction, finding the evidence sufficient and concluding the inaccurate Gazette article did not raise serious questions of possible prejudice under *Bigley*. *See Bigley*, 202 N.W.2d at 58 (adopting a standard that provides if "material disseminated during the trial goes beyond the record" and "raises serious questions of possible prejudice, the court . . . shall on motion of either party question each juror, out of the presence of the others, about his [or her] exposure to that material" (quoting ABA Standards Relating to Fair Trial & Free Press 3.5(f) (Am. Bar Ass'n 1968))). Gathercole sought further review, and we granted his application to explore in more detail the circumstances when midtrial publicity raises serious questions of possible prejudice. "Of necessity, this question is a complex one." *United States v. Herring*, 568 F.2d 1099, 1104 (5th Cir. 1978).

## II. Scope of Review.

We review the district court's refusal to grant a mistrial for an abuse of discretion. *State v. Marr*, 316 N.W.2d 176, 181 (Iowa 1982). The parties disagree, however, about the proper scope of review for the jury-polling question. Gathercole urges de novo review, *see State v. Holly*, 201 P.3d 844, 851 n.3 (N.M. 2009), while the State contends the abuse-of-discretion standard applies.

We agree with the State. Although the *Bigley* standard creates a mandatory duty to poll by using the word "shall," *see State v. Frank*, 298 N.W.2d 324, 327 (Iowa 1980), the duty only arises if the publicity raises serious questions of possible prejudice, *see Bigley*, 202 N.W.2d at 57–58. "The determination whether the publicity is so prejudicial that further inquiry is necessary is within the trial court's discretion." *Brown v. State*, 601 P.2d 221, 232 n.28 (Alaska 1979); *accord Marr*, 316 N.W.2d at

181; *Frank,* 298 N.W.2d at 327; *State v. Jones,* 511 N.W.2d 400, 408 (Iowa Ct. App. 1993). Accordingly, we review the district court's refusal to poll for an abuse of discretion.

**III. Analysis.**

Exercising our discretion to select the issues addressed on further review, we let the court of appeals decision stand as to Gathercole's sufficiency-of-the-evidence challenge and proceed directly to the midtrial publicity question. *See* Iowa R. App. P. 6.1103(1)(*d*); *State v. Rooney,* 862 N.W.2d 367, 370–71 (Iowa 2015).

The court of appeals concluded the *Bigley* standard contains both a qualitative component and a quantitative component. In other words, midtrial publicity only raises serious questions of possible prejudice if the information is outside the record, might invite the jury to decide the case on an improper basis, *and* likely reached one or more jurors. On further review, Gathercole contests that formulation. He asserts the *Bigley* standard contains no quantitative component, or if it does, it merely requires a showing that the risk of juror exposure is more than de minimis.

**A. Iowa Precedents.** In *Bigley,* "a newspaper article about the case . . . appeared on the third day of trial" on the sixth page of the local newspaper. *Bigley,* 202 N.W.2d at 56. The article

> was quite detailed and substantially factual. However, it noted defendant had previously pleaded guilty to the charge, was given probation, breached probation, was incarcerated, and then won his right to trial because of irregularities in connection with his guilty plea.

*Id.* The trial court denied Bigley's motion for mistrial or jury polling because it had admonished the jury to avoid news accounts of the trial and found no evidence any juror had violated the admonition. *Id.* We

affirmed on the same basis, but we adopted prospectively "workable guidelines" recommended by the American Bar Association (ABA) for resolving claims of prejudice arising from extra-record publicity occurring during trial. *Id.* at 58. The relevant ABA guideline extant at the time of the *Bigley* trial provided that if

> material disseminated during the trial goes beyond the record on which the case is to be submitted to the jury and raises serious questions of possible prejudice, the court may on its own motion or shall on motion of either party question each juror, out of the presence of the others, about his exposure to that material.

*Id.* (quoting ABA Standards Relating to Fair Trial & Free Press 3.5(f)).[1] We did not elaborate in *Bigley* on the definition of "serious questions of possible prejudice." *See id.*

We again confronted the problem of midtrial publicity in *Frank*, where local newspapers had published several stories during a lengthy continuance in the trial. *See Frank*, 298 N.W.2d at 326. The stories referred repeatedly to witnesses who had left Iowa but were subpoenaed to return and stated the witnesses had key testimony that was important to the State's case. *Id.* Frank did not request a jury poll but asserted on appeal that the trial court should have polled the jury sua sponte

---

[1]Since *Bigley*, the ABA has revised Standard 3.5(f). The relevant language now appearing in standard 8-5.5(d) reads:

> If, during the trial, the court determines that information has been disseminated or otherwise made publicly available that goes beyond the record on which the case is to be submitted to the jury and raises serious questions of prejudice, the court may on its own motion or on the motion of either party question each juror, out of the presence of the others, about exposure to that information.

ABA Criminal Justice Standards on Fair Trial & Free Press 8-5.5(d), www.americanbar.org/groups/criminal_justice/standards/crimjust_standards_fairtrial_blk.html. Because neither party asserts we should modify *Bigley*, we leave for another day the question whether to adopt the revised ABA standard.

because the published articles' myopic focus on the missing witnesses prejudiced her defense. *See id.* at 327. We concluded "the number and contents" of the articles were not "of sufficient magnitude to establish a substantial likelihood of probable jury prejudice" rendering the district court's decision not to poll the jury an abuse of discretion. *Id.* We declined to find prejudice "from the mere publication or broadcast of news stories" unless there is "evidence of jury exposure to trial publicity." *Id.* at 327–28.[2]

In *Marr*, a newspaper article containing numerous factual errors appeared after the jury was empaneled but before any trial testimony was received. *Marr*, 316 N.W.2d at 180. The district court conducted a jury poll upon request but, satisfied that the jurors who had read the article could remain impartial, denied the defendant's motion for mistrial. *See id.* We found no abuse of discretion in that ruling because "[a]lthough the article was factually inaccurate . . . , it alone d[id] not rise to the level of pervasive and inflammatory publicity denying the defendant" a fair trial. *Id.* at 181.

The question in this case is a logical extrapolation from *Marr*: When *does* factually inaccurate midtrial publicity endanger a trial's fairness and require the court to poll the jury upon request? Two United States Circuit Courts of Appeals have concluded an isolated misstatement in a published press report did not present a significant danger of prejudice. *See Booton v. Hanauer*, 541 F.2d 296, 298 (1st Cir. 1976) (concluding a trial judge did not err in failing to poll the jury when

---

[2]Several years later, the court of appeals concluded counsel's decision not to request a jury poll did not constitute ineffective assistance. *Frank v. State*, 376 N.W.2d 637, 641 (Iowa Ct. App. 1985). Frank's federal habeas corpus petition asserting the same ground was also unsuccessful. *Frank v. Brookhart*, 877 F.2d 671, 674–75 (8th Cir. 1989).

requested because the article published during trial "was inaccurate, but . . . not substantially misleading"); *United States v. McGann*, 431 F.2d 1104, 1109 (5th Cir. 1970) (concluding a trial judge correctly declined to examine the jury because the factual misstatements "were not of a substantial nature"). The difficulty comes, of course, in determining how substantial a published inaccuracy must be to raise serious questions of possible prejudice requiring jury polling upon request. As one court has noted, "The cases have given less attention to drawing the line between what is prejudicial publicity and what is not." *United States v. Hyde*, 448 F.2d 815, 849 (5th Cir. 1971).

**B. The Qualitative Component.** The parties agree the *Bigley* standard includes a qualitative component. Factors informing the qualitative analysis include "how closely related the publicity is to the case" and the tone the article, post, or broadcast displays. *Brown*, 601 P.2d at 232; *see also Herring*, 568 F.2d at 1104–05 (considering the publicity's effect on any defenses); *Harper v. People*, 817 P.2d 77, 84 (Colo. 1991) (en banc); *Holly*, 201 P.3d at 849–50. As the *Herring* court summarized,

> The court should consider how closely related to the case the material is. In this connection, the court should also examine the nature of the defenses raised in order to weigh the effects of the publicity on those defenses. Another important consideration is . . . . [whether the] material . . . not only recounts facts outside the record but also speculates directly on a defendant's guilt or innocence.

*Herring*, 568 F.2d at 1104 (footnotes omitted).

**C. The Quantitative Component.** While the parties agree the *Bigley* standard requires a qualitative analysis of the claimed prejudice, they do not agree on the question whether the court must also consider a quantitative component. Many cases applying the ABA standard we

adopted in *Bigley* evaluate the likelihood that the midtrial publicity reached the jury. *See, e.g., id.* at 1104–05; *Harper*, 817 P.2d at 84; *Holly*, 201 P.3d at 849–50. Courts confronting factually inaccurate midtrial publicity—but not specifically applying the ABA standard—have done so as well. *See, e.g., Brown*, 601 P.2d at 232 (concluding the prejudice determination includes a consideration of "the likelihood that the jury was exposed" to the publicity); *Lindsey v. State*, 295 N.E.2d 819, 824 (Ind. 1973) (noting the court should consider "the content of the publication and the likelihood of its having come to the attention of any juror"); *State v. West*, 350 N.W.2d 512, 519 (Neb. 1984) (stating broadly that the prejudice determination "is to be resolved by the trial court on the basis of an independent examination of all the circumstances"). We concur with these courts that have concluded the determination of whether the factually inaccurate midtrial publication raises serious questions of possible prejudice must consider quantitative factors such as frequency or extent of coverage, *Holly*, 201 P.3d at 849, and relative prominence or obscurity, *Brown*, 601 P.2d at 232. Courts assessing the possible prejudice arising from the midtrial publication of inaccurate information and the need for a jury poll should also consider

> the nature of the trial judge's previous instructions on the matter. Has the court told the jury not merely to disregard but not to examine at all any external information on the case, especially that which appears in the news media? Has the court so instructed the jury on a regular basis, and how much time has elapsed since the court's last directive and the dissemination of the material in question?

*Herring*, 568 F.2d at 1105; *accord Holly*, 201 P.3d at 849. Finally, courts should consider the publisher or broadcaster's reputation or standing—in other words, its credibility. *Cf. Williams v. Griswald*, 743 F.2d 1533, 1539 (11th Cir. 1984) (concluding jurors could not reasonably think

midtrial publicity was credible after the trial judge expressly admonished them that it was false).

Prominence of the published inaccuracy is a multifaceted inquiry evaluating not only the publication's prominence in the community, but also the article's prominence within the publication. One court refers to this consideration as "conspicuousness." *See Holly*, 201 P.3d at 849. Depending upon the publication, a particular article within it could be so conspicuous as to create a strong likelihood that the jurors encountered the information. *See, e.g.*, *United States v. Aragon*, 962 F.2d 439, 445 & n.9 (5th Cir. 1992) (concluding midtrial publicity likely reached the jury when it "appeared in the front page of the Metro section of the most widely circulated local paper" and "newspaper vending machines surrounded the courthouse"); *Herring*, 568 F.2d at 1103 ("[T]he headlines, photograph, and article appeared on the front page of Macon's leading morning newspaper."); *United States v. Lord*, 565 F.2d 831, 838 (2d Cir. 1977) ("The widespread availability of the newspapers as well as the prominent position occupied by the articles[] created a strong possibility that some jurors might have been exposed . . . ." (Footnote omitted.)); *Harper*, 817 P.2d at 85 ("The article appeared during the second day of trial in the local newspaper of [Grand Junction, Colorado,] a relatively small city."); *Holly*, 201 P.3d at 850 ("[T]he article was prominently featured on the front page of a local newspaper in [Alamogordo, New Mexico,] a small community.").

But the facts may also indicate the publicity was obscure or hidden enough as to make it unlikely the jurors encountered it. In other words, the *information* may not be conspicuous even if the publication is prominent. *See, e.g.*, *United States v. Bermea*, 30 F.3d 1539, 1558 (5th Cir. 1994) (concluding the likelihood the material reached the jury was

low because the allegedly prejudicial portion was "only three short paragraphs in the middle of a longer article"); *Williams*, 743 F.2d at 1539 ("The entire story was composed of only eight sentences and appeared once on an inside page of a local newspaper."); *United States v. Goodman*, 605 F.2d 870, 883 (5th Cir. 1979) ("[The article] appeared . . . at the bottom of an inside page of the business and sports section under the over-the-counter stock market quotations."); *State v. Mucha*, 47 A.3d 931, 940 (Conn. App. Ct. 2012) (noting prejudicial content "appeared in the final three paragraphs of the article on an inner page of the newspaper where a conscientious juror . . . would not come upon it easily"). As the Connecticut Appellate Court explained,

> A notorious article, prominently displayed in a local newspaper with a blaring headline, a boxed quotation or an accompanying photograph stating or displaying prejudicial information about a case might raise the possibility of juror exposure . . . at least to the point of requiring further judicial inquiry, regardless of whether the jury was instructed to avoid media coverage. In this case, however, . . . where the prejudicial content of the article was not so overtly and conspicuously published, there is no reason to believe that a diligent juror, attempting to follow the court's instructions to avoid all media coverage of the case, would ever be exposed to it.

*Mucha*, 47 A.3d at 940–41.

Prominence can also work in tandem with the credibility of the publisher. To assess credibility in this context, the court must consider both the publisher's credibility and the specific information's credibility. For example, a tabloid might be prominent but notoriously not credible. A single blog post from a blog with few readers or a public tweet from an account with few followers will present less risk of serious prejudice as well, because those sources are neither prominent nor necessarily credible. Furthermore, evaluating both the publication generally and the

specific information reduces the likelihood that midtrial publicity caused prejudice, even if it reached jurors, where the inaccurate statement was obviously inaccurate. *See, e.g., State v. Williams*, 105 N.W. 265, 270 (Minn. 1905) (concluding that although an article's "comments upon the manner and appearance of the defendant" were unfair, there was not enough possible prejudice to require a new trial because "the comments related to matters occurring in the presence of the jury, who were in a position to verify them"); *West*, 350 N.W.2d at 519 (finding no likelihood of prejudice from inaccurate information about the defendant's blood alcohol concentration because "[o]bviously, the decimal points . . . were in the wrong place" and any juror would know the information was wrong); *State v. Lagerquist*, 180 S.E.2d 882, 885 (S.C. 1971) ("[I]f any member of the jury read [the article] he could not help but detect that the writer had described the charges erroneously.").

Lastly, prominence of the published information can work in tandem with frequency. Midtrial publicity that appears repeatedly, appears in multiple publications, is both printed and broadcast, or is shared widely on social media more likely reaches the jury than publicity disseminated only through one channel, method, or medium. *See People v. Crowder*, 425 N.E.2d 994, 1001 (Ill. App. Ct. 1981) (concluding the trial court should have conducted a jury poll in part because the potentially prejudicial material "appeared in two of Rockford's daily papers"); *People v. Weaver*, 412 N.E.2d 1353, 1361 (Ill. App. Ct. 1980) ("[T]he potential for undue prejudice was great, and was significantly enhanced by the fact that the publicity complained of appeared not only in a local suburban paper . . . , but in city papers, and on major television and radio networks.").

**D. Applying the Factors.** We acknowledge that "in many instances it would be impossible for a defendant to show actual juror exposure . . . without a direct inquiry of the jurors themselves." *State v. Williams*, 305 S.E.2d 251, 261 (W. Va. 1983). Our quantitative standard on jury polling therefore evaluates the *likelihood* that information reached the jury rather than proof the jury was actually exposed to it. *See id.* at 261 n.5; *see also Harper*, 817 P.2d at 82 ("[R]equiring independent evidence of the jury's exposure to outside information as a prerequisite to polling the jury fails to acknowledge the significant obstacles to obtaining such evidence."); *State v. Varner*, 643 N.W.2d 298, 304 (Minn. 2002) (concluding a trial court "applied the wrong standard" when it "was not focused on . . . serious questions of possible prejudice, but rather on whether jurors . . . were actually prejudiced"); *State v. Clark*, 675 P.2d 557, 560 (Utah 1983) ("[W]here the publicity takes place during the trial, the defendant cannot ever show actual exposure or prejudicial effect unless the court allows the jury to be polled."). Likelihood in this context means "there is a realistic possibility that [the] information may have reached one or more of the jurors." *State v. Bey*, 548 A.2d 846, 867 (N.J. 1988).

We turn first to an analysis of the qualitative factors. The inaccurate information published in the Gazette article during the trial was directly related to the State's burden of proof and Gathercole's defense. Although the content of the article purporting to report on the State's evidence while the trial was underway was false and inconsistent with Gathercole's defense, we find it unlikely that any juror who read the misstatement would have credited it. The State's evidence established that the only palm print lifted from Rottmiller's vehicle was Rottmiller's. The prosecutor confirmed this in his opening statement and in his

closing argument, repeatedly informing the jurors that the State produced no physical evidence connecting Gathercole to the crime scene. The Gazette article was neither opinion-laden nor inflammatory in tone. Thus, the qualitative factors in our analysis do not lead us toward a conclusion that Gathercole established serious questions of possible prejudice arose from the Gazette article.

The quantitative factors are not supportive of Gathercole's position either. The Gazette is the most prominent news publication in Cedar Rapids. Yet, the record does not reveal whether the article in question was featured conspicuously on the Gazette's website, whether a significant number of website visitors viewed it, or whether (and if so, where) it appeared in print. The limited information in the record discloses only minimal social media interaction by a handful of website visitors. Additionally, as the district court noted, the Gazette article's misstatement did not appear in the headline. We acknowledge the headline would not necessarily have alerted a juror that the article was about this case, because it did not use Gathercole or Rottmiller's name. Thus, it is conceivable that a juror could have begun reading the article without realizing its connection to their jury service. However, a juror who clicked on the article and who was conscientious about the court's admonitions would likely have stopped reading as soon as they encountered Rottmiller's name—which appears *before* any mention of the palm print. *See Mucha,* 47 A.3d at 940 (doubting that a conscientious juror would come upon the potentially objectionable material inadvertently because it was in the final three paragraphs of an article on an inner page of the newspaper); *State v. Johnson,* 41 So. 3d 1188, 1204 (La. Ct. App. 2010) (describing a juror who saw a bland headline and began reading but stopped when he encountered information he

recognized from trial). Furthermore, the court's admonition directed jurors to *avoid* media reports—not just to disregard them—and the court gave a renewed warning, including a specific mention of media, immediately before recessing the jury on the afternoon the article appeared.

In one federal case examining midtrial publicity, the court noted "the jurors had not been forbidden to read all newspapers—only accounts of the trial," so the fact jurors had been seen reading the newspaper in which midtrial publicity appeared weighed in favor of at least a realistic possibility the jurors had come across the potentially prejudicial material. *United States v. Thompson*, 908 F.2d 648, 652 (10th Cir. 1990). The district court's admonitions in this case were similarly limited. The court did not admonish jurors to avoid news altogether, only "news accounts of this trial," whatever form they might take. However, the record in this case does not reveal whether, as in *Thompson*, any juror read any part of the February 5 Gazette online or print edition. We decline to speculate on this record that they did.

The record in this case does not demonstrate a realistic possibility that the challenged information reached the jury. We conclude Gathercole did not establish the Gazette article raised serious questions of possible prejudice and the district court therefore did not abuse its discretion in denying the motions for mistrial and jury polling. Our confidence in this conclusion is strengthened by Gathercole's failure to (1) submit a supplemental motion or brief regarding midtrial publicity despite the court's invitation, (2) renew his request for a jury poll after the verdict but before the court dismissed the jury, or (3) make any posttrial motion supported by evidence the Gazette article reached the jury.

Although the district court did not abuse its discretion in this case, we encourage courts to resolve doubts about whether information published midtrial requires a poll requested by a party in favor of granting a poll. *See, e.g., Harper*, 817 P.2d at 84; *State v. Keliiholokai*, 569 P.2d 891, 894 (Haw. 1977) (suggesting inquiry is proper where "the probabilities of prejudice are not clearly evident and it is not known whether the jurors have been exposed"); *Bey*, 548 A.2d at 869 (noting "a court might properly choose to err on the side of caution when ruling on" motions to poll the jury, preferring the "prophylactic" measure of polling to uncover prejudice—or confirm its absence—"before ordering a new trial has become the only option"). Although one court has suggested a jury poll during a trial might be less than a perfect means of discerning the nature and extent of prejudice, if any, resulting from factually inaccurate midtrial publicity, "it at least gives some suggestion as to whether the verdict was tainted with improper consideration and improper influences." *People v. Cox*, 220 N.E.2d 7, 9 (Ill. App. Ct. 1966).

**E. Jury Admonition or Instruction.** Lastly, we take this opportunity to recommend that district courts supplement their jury admonitions and instructions to accommodate technological progress and the danger it can pose to fair and impartial trials. *See Webster*, 865 N.W.2d at 240–41 (recommending a jury admonition that specifically targets social media use leading to possible juror misconduct claims). As we did in *Webster*, we refer to the United States Judicial Conference Committee on Court Administration and Case Management's recommended jury instructions as a possible guide for Iowa judges. *See id.* One of the recommended instructions states, in part,

> You may not use . . . electronic means to investigate or communicate about the case because it is important that you decide this case based solely on the evidence presented in this courtroom. Information on the internet or available through social media might be wrong, incomplete, or

inaccurate. You are only permitted to discuss the case with your fellow jurors during deliberations because they have seen and heard the same evidence you have. In our judicial system, it is important that you are not influenced by anything or anyone outside of this courtroom. Otherwise, your decision may be based on information known only by you and not your fellow jurors or the parties in the case. This would unfairly and adversely impact the judicial process.

Judicial Conference Comm. on Ct. Admin. & Case Mgmt., U.S. Cts., *Proposed Model Jury Instructions: The Use of Electronic Technology to Conduct Research on or Communicate about a Case* (2012), www.uscourts.gov/file/3159.

A Florida judge has suggested a similar instruction:

It is important that you follow my court orders. If you gather information on your own, you may then make decisions with information that is different from information considered by all the other jurors. Your information and research may simply be wrong, inaccurate, or incomplete. Locations may change. The lawyers would have no method of knowing what research or information you have considered. The lawyers would be unable then to question or rebut your research or information. The law prohibits jurors from considering information that may be irrelevant or prejudicial to a party.

If you violate my order by communicating on social media sites or conducting research, you may cause a mistrial. A mistrial wastes your money as a taxpayer and causes the entire trial to begin anew regardless of how far we have come in the trial when your misconduct is discovered. A mistrial unfairly delays justice to the parties and wastes everyone's time, including the time of the judge, the attorneys, the parties, the witnesses, and your fellow jurors.

. . . .

While you may feel that the judge and the attorneys are hiding information from you, it is important that the judge decide which information should be provided to jurors to maintain fair proceedings for all parties and to maintain the integrity of the courts.

Antoinette Plogstedt, *E-Jurors: A View from the Bench*, 61 Clev. St. L. Rev. 597, 648 (2013).

Both instructions we quote here are adaptable for use in Iowa and can be adjusted to accommodate factual scenarios like the one presented in this case. For example, an instruction or admonition might target affirmative research *and* inadvertent discovery of information outside the trial record, emphasizing that information obtained either way could be wrong or inaccurate. We encourage courts to add references to electronic media to their existing media admonitions. By acknowledging and anticipating jurors' use of technology, district courts "will minimize the risk of unnecessary and costly mistrials due to the failure of jurors to . . . understand [clearly] their obligations in the electronic world." *Webster*, 865 N.W.2d at 241.

**IV. Conclusion.**

Under the *Bigley* standard, courts must poll the jury about exposure to midtrial publicity only if the material raises serious questions of possible prejudice. In determining whether information raises serious questions of possible prejudice, judges should consider both qualitative and quantitative factors. Applying those factors, we conclude on this record that the factually inaccurate Gazette article appearing online during Gathercole's trial did not raise serious questions of possible prejudice. The evidence presented at trial clearly contradicted the article, and the jury knew it could only consider evidence presented in court. Furthermore, there was not a realistic possibility the article reached the jury. Accordingly, the district court did not abuse its discretion in denying Gathercole's motion for a mistrial and alternative motion to poll the jury. We affirm Gathercole's convictions.

**COURT OF APPEALS DECISION AND DISTRICT COURT JUDGMENT AFFIRMED.**