# IN THE COURT OF APPEALS OF IOWA

No. 18-0038
Filed February 20, 2019

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**DRESEAN MAURICE BARBER,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Polk County, Karen A. Romano, Judge.

Dresean Barber appeals his convictions to one count of second-degree murder and one count of assault with intent to inflict serious injury. **AFFIRMED.**

Andrew Dunn and Gina Messamer of Parrish Kruidenier Dunn Boles Gribble Gentry Brown & Bergmann L.L.P., Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Louis S. Sloven, Assistant Attorney General, for appellee.

Considered by Tabor, P.J., and Mullins and Bower, JJ.

**MULLINS, Judge.**

A jury convicted Dresean Barber of second-degree murder and assault with intent to inflict serious injury in relation to the 2015 shooting death of Edmanuel Perez and wounding of Andrew Hurley-Boyd. On appeal, Barber challenges the district court's denial of his right to present a defense based upon statutes that were amended after he was arrested and charged. He also challenges the court's denial of his motion for mistrial or alternatively its refusal to voir dire the jury, after a mass shooting occurred in Las Vegas during jury deliberations. Barber further contends the court abused its discretion in failing to clear the jury's confusion on malice aforethought. Barber also claims the prosecutor's questions during cross-examination constituted prosecutorial misconduct. Lastly, Barber contends the jury's verdicts were not supported by substantial evidence.

## I. Background Facts and Proceedings

Upon the evidence presented at trial, a reasonable jury could make the following factual findings. Prior to 2013, Barber was a member of a group of friends, which included Perez, Hurley-Boyd, and Perez's brother, Eddie. At some point in 2013, there was a physical altercation between members of the group, including Perez and Barber, which resulted in a falling out and Barber's exclusion from the group. Between that time and November 29, 2015, tension continued between Barber and the other members of the group, which resulted in further altercations, including some that were physical. There was no law enforcement intervention in any of these occurrences.

During the late-night hours of November 28 and into the early-morning hours of November 29, Perez, Hurley-Boyd, and other members of the group met

at Hurley-Boyd's apartment to drink and socialize before heading downtown to the local bar and club area. Some of the group also smoked marijuana while at the apartment. Once downtown, the group ended up in a building that houses multiple bars and clubs. A common stairwell provided access to the various floors and establishments. The group initially entered the same bar and continued to drink but eventually split up to go to the other bars in the building. Before closing time, several members of the group decided it was time to leave and proceeded to locate the others and inform them it was time to go. At some point, members of the group encountered Barber.

The parties differ as to the nature of this meeting and the resulting shooting. Barber's version is that he went outside to smoke with his cousin and a friend. Perez and another group member approached him and exchanged words. Barber called his brother to pick him up and waited for his brother inside. Once his brother arrived, he left the building and ran into Hurley-Boyd and another group member. Words were again exchanged. Hurley-Boyd and the other group member yelled at him and were ready to fight. Barber explained that he was just trying to leave and flashed his gun in hopes they would leave him alone. Barber backed up toward a parking ramp but Perez, Eddie, and other group members were in the street heading toward him, resulting in Barber being pushed against a vehicle. Barber pulled his gun and shot into the air, causing Hurley-Boyd to stop. However, Perez continued to move toward Barber, so Barber shot Perez. Hurley-Boyd then swung at Barber, so Barber shot Hurley-Boyd. After shooting Hurley-Boyd, Barber fled the scene with his brother and disposed of the gun. The next day, Barber learned Perez had died.

Hurley-Boyd's version was that he and another member of the group were attempting to gather the other members to meet outside in order to leave. Hurley-Boyd exited the building, and when he was about to reenter the building, he encountered Barber near the entryway. Both became defensive and were ready for a fight, at which point Barber displayed the gun he was carrying in his waistband. After seeing the gun, Hurley-Boyd testified he put his hands in the air, backed up out of the entry way, and let everyone in the area know Barber had a gun. Hurley-Boyd turned around and was hit in the face with a gun by someone he believed was with Barber. Hurley-Boyd then heard a shot and when he turned around he saw Barber pulling his gun down from the air. Hurley-Boyd did not remember anything else until he woke up from a coma.

Eddie's version is that as he and Perez were gathering the other group members, he ran into Barber, who was with a group of about ten other people. Eddie left the building in order to avoid being cornered and moved into the middle of the street. He saw one of Barber's friends hit Hurley-Boyd in the head with a gun and another friend threw a bottle toward Perez and himself. Eddie then saw a gun flash over Barber's head, who was approximately ten to fifteen feet away near the sidewalk. Perez told Eddie he had been shot so Eddie attempted to give first aid. After the gun shots, everyone in the vicinity scattered and Barber disappeared into the crowd. Police secured the scene and medical personnel tended to Perez and Hurley-Boyd.

Barber shot Perez in the right chest area, tearing a hole in his aorta. He died from the resulting blood loss. Barber shot Hurley-Boyd in the side. Hurley-Boyd spent over a month in the hospital, requiring several surgeries. He was also

in a coma for a period of time. The State charged Barber with one count of first-degree murder and one count of attempt to commit murder. The case proceeded to a jury trial. Prior to trial, Barber provided notice that he would assert a justification defense. He also filed a motion asking the court to recognize and allow him to present his justification defense based upon amendments to the Iowa Code enacted by House File 517, commonly referred to as the "stand your ground" defense. *See generally* 2017 Iowa Acts ch. 69, §§ 37–44. House File 517 took effect largely on July 1, 2017.[1] The court denied his request, finding the shooting occurred before the amendments to the code and the amendments were prospective, not retrospective, in nature. During arguments concerning proposed jury instructions, the defense renewed its argument and asked the court to provide instructions to the jury consistent with the amended statutes. The court again denied Barber's request. The court's instructions to the jury included Barber's justification defense as defined in the code prior to the July 1 amendments.

The trial commenced on September 18, during which Barber testified on his own behalf. The jury began deliberations on Friday, September 29. By the end of the day, the jury had not yet reached a verdict, so the court released the jury for the weekend. Over the weekend break, a shooting in Las Vegas occurred which lead to numerous deaths and injuries and had prominent coverage in news media. Once court resumed on Monday, October 2, the defense sought a mistrial, arguing the shooting and subsequent news reports prejudiced the jury, therefore Barber

---

[1] The act expressly provided several amendments to the Code took effect immediately upon enactment on April 13, none of which are applicable to this case. *See* 2017 Iowa Acts ch. 69, § 50; *see also* Iowa Const. art. III, § 26 (providing legislation with no express effective date becomes effective on July 1 of the year of enactment).

could no longer receive a fair trial. Alternatively, the defense argued the court should poll the jury to determine what, if any, prejudicial effect the shooting may have had on the jurors. The court denied both requests.

The jury ultimately found Barber guilty of two lesser-included offenses: second-degree murder and assault with intent to inflict serious injury. Barber filed a motion for a new trial or for judgment of acquittal, raising twenty-six different claims. The court denied the motion and proceeded to sentencing. The court sentenced Barber to an indeterminate term of incarceration not to exceed fifty years with a mandatory minimum of thirty-five years for the murder offense and an indeterminate term of incarceration of two years for the assault offense, to run consecutively. Barber appeals.

## II.    Analysis

### A.    Justification Defense

Barber first claims the court erred in denying him the opportunity to fully present a justification defense, consistent with the revised "stand your ground" law. He argues the changes to the code relating to the defenses of justification and self-defense should apply retroactively, pursuant to the general-saving provision found in Iowa Code section 4.13(2) (2015). The court should then have instructed the jury accordingly, including providing the revised definition of "reasonable force" and instructing the jury that Barber was under no duty to retreat before acting.

We review questions of statutory interpretation for correction of errors at law. *State v. Coleman*, 907 N.W.2d 124, 134 (Iowa 2018). We also review challenges to jury instructions for correction of errors at law. *State v. Harrison*, 914 N.W.2d 178, 188 (Iowa 2018). On April 13, 2017, the governor signed into law

House File 517. *See generally* 2017 Iowa Acts ch. 69. The act contains numerous modifications to the Iowa Code relating to the possession of weapons, including the modification of the definition of reasonable force, codified in section 704.1.[2] *See id.* § 37. Further, the amendment added language to the definition of deadly force.[3] *See id.* § 38. The act also added section 704.13, which provides immunity from "criminal or civil liability incurred by the aggressor pursuant to the application of reasonable force." *See id.* § 43. The amendment also no longer required an individual to retreat,[4] thus the "stand your ground" moniker. *See id.* § 37(3). Several provisions took effect immediately upon enactment, but the bulk of the

---

[2] Prior to July 1, 2017, Iowa Code section 704.1 (2016) defined reasonable force as:

> that force and no more which a reasonable person, in like circumstances, would judge to be necessary to prevent an injury or loss and can include deadly force if it is reasonable to believe that such force is necessary to avoid injury or risk to one's life or safety or the life or safety of another, or it is reasonable to believe that such force is necessary to resist a like force or threat. Reasonable force, including deadly force, may be used even if an alternative course of action is available if the alternative entails a risk to life or safety, or the life or safety of a third party, or requires one to abandon or retreat from one's dwelling or place of business or employment.

Iowa Code § 704.1 (2016). Effective July 1, 2017, "reasonable force" means:

> that force and no more which a reasonable person, in like circumstances, would judge to be necessary to prevent an injury or loss and can include deadly force if it is reasonable to believe that such force is necessary to avoid injury or risk to one's life or safety or the life or safety of another, or it is reasonable to believe that such force is necessary to resist a like force or threat.

Iowa Code § 704.1(1) (2017). Further, "[a] person may be wrong in the estimation of the danger or the force necessary to repel the danger as long as there is a reasonable basis for the belief of the person and the person acts reasonably in the response to that belief." *Id.* § 704.1(2).

[3] The 2017 legislation amended Section 704.2(2) to include:

> "Deadly force" does not include a threat to cause serious injury or death, by the production, display, or brandishing of a deadly weapon, as long as the actions of the person are limited to creating an expectation that the person may use deadly force to defend oneself, another, or as otherwise authorized by law.

[4] "A person who is not engaged in illegal activity has no duty to retreat from any place where the person is lawfully present before using force as specified in this chapter." Iowa Code § 704.1(3).

revisions and additions to the Code took effect on July 1, 2017. *See id.* § 50; *see also* Iowa Const. art. III, § 26.

"Statute[s] [are] presumed to be prospective . . . unless expressly made retrospective." Iowa Code § 4.5. It is also "well-settled law that substantive amendments to criminal statutes do not apply retroactively." *Harrison*, 914 N.W.2d at 205. Further,

> The reenactment, revision, amendment, or repeal of a statute does not affect . . . [t]he prior operation of the statute or any prior action taken under the statute. . . . [or] [a]ny violation of the statute or penalty, forfeiture, or punishment incurred in respect to the statute, prior to the amendment or repeal.

Iowa Code § 4.13(1)(a), (c). However, Iowa Code section 4.13(2) provides that "[i]f the penalty, forfeiture, or punishment for any offense is reduced by a reenactment, revision, or amendment of a statute, the penalty, forfeiture, or punishment if not already imposed shall be imposed according to the statute as amended." Barber argues that the amendments to the justification defense have the practical effect of reducing the penalty for his actions, as his actions are no longer considered crimes and so there is no punishment, and therefore the amended statutes should have applied.

The shooting in this case took place during the early morning hours of November 29, 2015, well before both the governor signed the act into law and its effective date of July 1, 2017. The only language in any of the amendments, additions, or revisions to the code under House File 517 which expressly made an amended statute retrospective was the addition of subsection three to Iowa Code section 724.28 *See* 2017 Iowa Acts ch. 69, § 32(3). Section 724.28 is not applicable in this case. Otherwise, the act only provides that certain amendments,

none of which are applicable here, will take effect immediately upon enactment. *See id.* § 50. Therefore, the amended statutes applicable to this case were not expressly made retrospective.

Further, the amendments to the code were substantive in nature, redefining, among other things, "reasonable force" and "deadly force." Since the justification defense, as amended, did not exist in the Iowa Code at the time of the shooting, Barber was not entitled to argue or have the court instruct the jury based upon the amended code. *Harrison*, 914 N.W.2d at 205. Barber was still allowed to assert and argue a justification defense but as defined in the code before the 2017 amendments. The provided jury instructions properly informed the jury of the law on justification in effect at the time of the shooting. We therefore find no error.

B.  Motion for Mistrial

Barber next claims the court improperly failed to either grant a mistrial or permit voir dire of the jury after deliberations began due to a shooting in Las Vegas. He claims that because the news of the shooting was unavoidable and despite any admonitions, the jury and its verdict could have been influenced and prejudiced by the event, thus depriving him of a fair trial.

The court submitted the case against Barber to the jury on Friday, September 29, 2017, at 3:34 p.m. The court released the jury for the weekend at 4:30 p.m. to resume deliberations on Monday, October 2. During the evening of October 1, a gunman opened fire from a high floor overlooking a concert in Las Vegas. The gunman killed over fifty people and injured hundreds. On October 2, the court heard from both parties on Barber's request for a mistrial. Barber focused on the magnitude and reporting of the shooting and its potential prejudicial effect

on the jury. Barber contended the jury was prejudiced because the case against him and the Las Vegas incident both involved a shooting in a public place where people were injured and killed. Barber also requested that if the court denied his motion for mistrial, it should conduct an individual voir dire of the jury members to determine if the shooting had any effect on them or their ability to be fair and impartial in this case. The State resisted.

The court found the shooting in Las Vegas was not a local event and the facts were dissimilar to the facts involved in the present case: a person shooting random people from a hotel room versus Barber shooting two people he knew and in the past considered friends. The court determined that because of the dissimilarity there was not a potential to prejudice the jury and denied the mistrial motion. Further, the court found that if it questioned the jurors, it could be interjecting outside information that jury members may not know of or highlighting information that would do more harm and cause more issues than it might cure. The court denied the request to voir dire the jury and took no action based on the incident in Las Vegas, relying on its previous admonitions given to the jury. Barber reasserted his arguments in his motion for a new trial after the verdict.

We review the district court's refusal to grant a mistrial for an abuse of discretion. *State v. Gathercole*, 877 N.W.2d 421, 427 (Iowa 2016). Further, "we review the district court's refusal to poll for an abuse of discretion." *Id.* The "mere refusal by [the] trial court to question the jury at the time requested did not deprive defendant of a fair trial." *State v. Bigley*, 202 N.W.2d 56, 57 (Iowa 1972). In *Bigley*, the supreme court adopted a standard that if "material disseminated during the trial goes beyond the record . . . and raises serious questions of possible prejudice, the

court may on its own motion or shall on motion of either party question each juror, out of the presence of the others, about his exposure to that material." *Id.* at 58. Though "the *Bigley* standard creates a mandatory duty to poll by using the word 'shall' . . . the duty only arises if the publicity raises serious questions of possible prejudice." *Gathercole*, 877 N.W.2d at 427. "The determination whether the publicity is so prejudicial that further inquiry is necessary is within the trial court's discretion." *Id.* (quoting *Brown v. State*, 601 P.2d 221, 232 n. 28 (Alaska 1979)).

The "*Bigley* standard includes a qualitative component. Factors informing the qualitative analysis include 'how closely related the publicity is to the case.'" *Id.* at 429. In examining "how closely related to the case the material is. . . . the court should also examine the nature of the defenses raised in order to weigh the effects of the publicity on those defenses." *Id.* (quoting *United States v. Herring*, 568 F.2d 1099, 1104 (5th Cir.1978)). The court must also "consider quantitative factors such as frequency or extent of coverage." *Id.*

While the notoriety of the shooting made it possible that jurors could have heard something about the shooting, qualitatively, as the district court noted, the case against Barber and the circumstances of the Las Vegas shooting are dissimilar. In addition to the geographic distance between Las Vegas and Iowa, Barber claimed he shot Perez and Hurley-Boyd, two people he knew and once considered friends, in self-defense. In the Las Vegas shooting, a gunman shot from a hotel room at people attending a nearby concert. There are no reports the gunman knew any of the people he shot at or that he was targeting anyone in particular. Further, there are no reports the gunman acted in self-defense.

Before the jury was selected, the court admonished the potential jury pool that they must avoid communicating about the case, including their own participation, with others, whether speaking in person, over the phone, or through social media. Further, because of the media coverage already present with the case, the court admonished the jury to avoid any forms of media during the case to avoid being unduly influenced based on possible incomplete or distorted coverage. During each break during the proceedings, the court reminded the jury about this admonition and often stressed the need to avoid media. When the court released the jury for the weekend on September 22, the court again reminded the jurors of the admonishment and cautioned the jurors to avoid media coverage. After the trial resumed on September 25, the court asked and confirmed that no juror had been exposed to any media coverage over the weekend. No reported jury questions or concerns relating to the Las Vegas shooting appear in the record after the jury reconvened on October 2.

Additionally, in the court's instructions to the jury, the court admonished the jury several times that its verdict should only be based on the evidence presented during trial and the jurors should only rely on matters presented in court, including:

> As you consider the evidence, do not be influenced by any personal sympathy, bias, prejudices or emotions. . . . [Y]ou are to evaluate the evidence carefully and avoid decisions based on generalizations, gut feelings, prejudices, sympathies, stereotypes, or biases.
> . . . .
> The defendant may not be convicted except upon proof beyond a reasonable doubt of every element necessary to constitute the crimes with which he is charged.
> . . . .
> If you decide a case based on information not presented in court, you will have denied the parties a fair trial in accordance with the rules of this state and you will have done an injustice.

We presume juries follow the court's instructions. *State v. Hanes*, 790 N.W.2d 545, 552 (Iowa 2010). At the time of the request for mistrial, all evidence had been presented and the case was submitted to the jury. There was no reason to believe or indication that any juror had violated the court's admonitions or instructions. Based upon our review, we find no serious questions of possible prejudice were raised and we conclude the district court did not abuse its discretion in declining to poll the jury or grant a mistrial.

C.     Prosecutorial Misconduct

Barber also claims the State's cross-examination of him constituted prosecutorial misconduct. He contends the State's question of whether a knife found near Perez belonged to him was misconduct because the State knew before asking that the knife did not belong to him and instead belonged to Perez. Barber argues the State's false insinuation deprived him of a fair trial.

"Trial courts have broad discretion in ruling on claims of prosecutorial misconduct and we review such rulings for an abuse of discretion." *State v. Plain*, 898 N.W.2d 801, 810–11 (Iowa 2017) (quoting *State v. Jacobs*, 607 N.W.2d 679, 689 (Iowa 2000)). We will "reverse if the district court's decision rested on grounds or reasoning that were clearly untenable or clearly unreasonable. Grounds or reasons are untenable if they are 'based on an erroneous application of the law or not supported by substantial evidence.'" *Id.* at 811 (quoting *State v. Dudley*, 856 N.W.2d 668, 674 (Iowa 2014)). Barber "must show both (1) error or misconduct and (2) prejudice." *Id.* at 818.

During redirect examination by the defense, defense counsel asked Barber about a knife found at the scene and if he had ever seen it before. Barber testified that on the night of the shooting he did not see anyone with a knife, however, he had seen Perez with a similar knife in the past. On recross-examination by the State, the State questioned Barber further about the knife, including asking, "Is this your knife?" Barber answered, "No." Following Barber's examination by both parties, Barber moved for a mistrial, contending the State was aware of the knife's owner before asking Barber if the knife was his. The court denied the motion, finding that though a police report indicated the knife fell out of a victim's pocket, it did not say that this victim was Perez or definitively that the knife belonged to Perez. Further, because the defense raised the knife as an issue, the State was allowed to ask questions about it on cross-examination. The court did, however, limit the State from arguing further that the knife was Barber's but, because no evidence before the jury indicated exactly to whom the knife belonged, the State could argue that the owner of the knife was unknown.

On our review of the record, Barber's argument that the State knew the knife belonged to Perez is based upon a police report which states the knife fell out of the victim's pants. However, the report in question was written by an officer who did not testify. Further, the officer who authored the report indicated a police sergeant advised him that a knife found on the street fell out of one of the victim's pockets. That police sergeant did testify and did not remember finding said knife on the night in question or being informed about the presence of the knife or its location. While a police technician testified he collected the knife from the street next to Perez's shoe, another detective testified that because the scene was

chaotic and with the number of people in the area who may have gone through before police could manage the crime scene, there was a potential that evidence on the street could have been moved or kicked around. Based upon the record, we find the ownership of the knife is not clear. Once the defense raised the knife as an issue, the State was entitled to ask questions about it. Once Barber denied ownership of the knife and there was no other evidence suggesting Barber owned the knife, the State was not entitled to argue further that the knife was Barber's and the court instructed as such. We therefore cannot find the decision by the court rested on clearly untenable or unreasonable grounds, and we find no abuse of discretion in the court's ruling.

D. Jury Question

Barber also claims the court erred in not providing clarification to a question from the jury after deliberations began. He contends that in response to a jury question about malice aforethought, the court should have given a definitive response rather than merely instructing the jury to reread the instructions.

A "district court has a 'duty to instruct fully and fairly' on the law applicable to 'all issues raised by the evidence.'" *State v. Schuler*, 774 N.W.2d 294, 297 (Iowa 2009) (quoting *State v. Stallings*, 541 N.W.2d 855, 857 (Iowa 1995)). When the jury asks a question or for clarification during deliberations, "the district court has the discretion to decide whether or not to provide an answer." *State v. Stokes*, No. 14-1000, 2016 WL 718969, at *5 (Iowa Ct. App. Feb. 24, 2016); *see* Iowa R. Civ. P. 1.925; *see also* Iowa R. Civ. P. 2.19(5)(g). "A discretionary ruling is presumptively correct, and on appeal will be overturned only where an abuse of discretion has been demonstrated. An abuse is found only where the discretion is

exercised on grounds or for reasons clearly unreasonable." *State v. McCall*, 754 N.W.2d 868, 871 (Iowa Ct. App. 2008) (quoting *State v. Watkins*, 463 N.W.2d 15, 18 (Iowa 1990)).

During deliberations, the jury submitted the question, "Does the use of a dangerous weapon automatically equal malice aforethought?" Barber argued the court should respond with a definitive no. However, the court declined to do so and instead instructed the jury that "they have all of the applicable law in the instructions and you should reread the instructions." "Malice aforethought is inferred simply from the use of the dangerous weapon." *State v. Green*, 896 N.W.2d 770, 781 (Iowa 2017). The disputed instruction accurately states the law and is not unclear. Therefore, we conclude the district court did not abuse its discretion when answering the jury's question with the response to reread the instructions.

E.      Sufficiency of the Evidence

Barber finally contends the jury verdicts were not supported by substantial evidence. He focuses his claims on the intent elements of both offenses, arguing the State failed to establish the requisite intent or that he acted without justification for each offense.

"Sufficiency of evidence claims are reviewed for correction of errors at law, and we will uphold a verdict if substantial evidence supports it." *State v. Ramirez*, 895 N.W.2d 884, 890 (Iowa 2017). We view the evidence "in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence." *State v. Ortiz*, 905 N.W.2d 174, 180 (Iowa 2017) (quoting *State v. Huser*, 894 N.W.2d 472, 490 (Iowa 2017)). "Evidence is considered

substantial if, when viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt." *Ramirez*, 895 N.W.2d at 890 (quoting *State v. Reed*, 875 N.W.2d 693, 704–05 (Iowa 2016)). Such "evidence must do more than raise 'suspicion, speculation, or conjecture' regarding defendant's guilt." *State v. Randle*, 555 N.W.2d 666, 671 (Iowa 1996) (quoting *State v. Barnes,* 204 N.W.2d 827, 829 (Iowa 1972)). "We consider all the record evidence, not just the evidence that supports the verdict." *State v. Biddle*, 652 N.W.2d 191, 197–98 (Iowa 2002).

### 1. *Perez—Malice Aforethought*

To convict on second-degree murder, the instructions required the jury to find: (1) Barber shot Perez; (2) Perez died as a result of being shot; (3) Barber acted with malice aforethought; and (4) Barber acted without justification. Barber argues the State failed to prove the third and fourth elements. The court instructed the jury:

> "Malice" is a state of mind which leads one to intentionally do a wrongful act to the injury of another or in disregard of the rights of another out of actual hatred, or with an evil or unlawful purpose. It may be established by evidence of actual hatred, or by proof of a deliberate or fixed intent to do injury. It may be found from the acts and conduct of the defendant, and the means used in doing the wrongful and injurious act. Malice requires only such deliberation that would make a person appreciate and understand the nature of the act and its consequences, as distinguished from an act done in the heat of passion.

The court also instructed "'[m]alice aforethought' is a fixed purpose or design to do some physical harm to another which exists before the act is committed. It does not have to exist for any particular length of time." Further, "malice aforethought maybe inferred from [Barber]'s use of a dangerous weapon." The jury was

instructed that "[m]urder in the second degree does not require a specific intent to kill another person."

Here, the evidence showed, and Barber does not deny, that he shot Perez with a gun. The use of a gun supports the inference that Barber intended to cause Perez's death. "[I]f the jury rejected [Barber]'s [justification] argument, it could, but was not required to, infer [Barber] acted with malice aforethought from his use of a dangerous weapon." *Green*, 896 N.W.2d at 781. Taken in the light most favorable to the State, we find the record contained substantial evidence for a reasonable jury to conclude Barber acted with malice aforethought beyond a reasonable doubt.

### 2.     Hurley-Boyd—Specific Intent

To convict on assault with intent to inflict serious injury, the instructions required the jury to find: (1) Barber did an act intended to either (a) cause pain or injury, (b) result in insulting or offensive physical contact, or (c) place Hurley-Boyd in fear of immediate physical contact which would be painful, injurious, insulting, or offensive to Hurley-Boyd; (2) Barber had the apparent ability to do the act; (3) the act was done with the specific intent to cause a serious injury; and (4) Barber acted without justification. Barber challenges the third and fourth elements of this offense.

The court instructed the jury that "'[s]pecific intent' means not only being aware of doing an act and doing it voluntarily, but in addition, doing it with a specific purpose in mind." The court also instructed the jury that specific intent is "seldom capable of direct proof" so the jury "should consider the facts and circumstances

surrounding the act to determine [Barber]'s intent." Further, the jury could, "but [was] not required to, conclude a person intends the natural result of his acts."

The evidence shows, and Barber admitted, that after firing a warning shot he took the gun, levelled it at Perez, and shot him. He then claims Hurley-Boyd swung at him so he shot at Hurley-Boyd. The fact that Barber used a gun and shot at Hurley-Boyd and, in fact, hit him supports an inference that he had the specific intent to seriously injure Hurley-Boyd. Based on all of the facts and circumstances contained in the record, we conclude the jury could reasonably infer that Barber intended to seriously injure Hurley-Boyd.

### 3. Justification

As to both shootings, Barber contends he acted with justification, claiming the group of individuals with Perez and Hurley-Boyd were aggressively coming at him, after he both retreated into the club to wait for his ride and fired a warning shot once outside.

The court instructed the jury that "a person may use reasonable force to prevent injury to a person, including [injury to themselves]." The instructions defined reasonable force as "only the amount of force a reasonable person would find necessary to use under the circumstances to prevent death or injury." The jury was also instructed "[a] person can use deadly force against another if it is reasonable to believe that such force is necessary to avoid injury or risk to one's life or safety or the life or safety of another, or it is reasonable to believe that such force is necessary to resist a like force or threat." Further, "[a] person is justified in using reasonable force if he reasonably believes the force is necessary to defend himself from any actual or imminent use of unlawful force."

The court also instructed the jury that it should find Barber was unjustified if the State proved: (1) Barber started or continued the incident which resulted in injury or death; (2) an alternative course of action was available to Barber; (3) Barber did not believe he was in imminent danger of death or injury and the use of force was not necessary to save him; (4) Barber did not have reasonable grounds for the belief; or (5) the force used by the defendant was unreasonable.

The record contains conflicting evidence on the issue of justification, specifically the location of Barber, Hurley-Boyd, and Perez in relation to one another, in addition to the presence of other people ready to fight or not. Further, there was conflicting evidence as to what options, if any, Barber had available to him rather than shooting Hurley-Boyd and Perez. There was also conflicting evidence on whether Perez had a leg injury that prevented him from running or charging at someone, as Barber contended. Because there was no video of the actual shooting and what video is available provides only partial information as to the series of events that night, eyewitness evidence was the crux of the State's case against Barber. As the court instructed, the jury members were the "judges of . . . witnesses' credibility and the weight to be given their testimony." "The very function of the jury is to sort out the evidence presented and place credibility where it belongs." *State v. Blair*, 347 N.W.2d 416, 420 (Iowa 1984). Further, "the jury was free to reject certain evidence, and credit other evidence." *State v. Hickman*, 623 N.W.2d 847, 849 (Iowa 2001). Viewing the evidence in the light most favorable to the State and drawing all reasonable inferences in favor of the verdict, there was substantial evidence that Barber had alternative courses available to him that night other than shooting Perez and Hurley-Boyd and, therefore, Barber acted without

justification.  Consequently, we find the verdicts are supported by substantial evidence.

**III.  Conclusion**

The 2017 amendments to the justification defense at issue in this case were prospective, not retrospective, as the amendments were not expressly made retrospective and were substantive in nature.  As such, Barber was not entitled to argue or have the court instruct the jury based upon the 2017 amendments to the Iowa Code.  Barber was still allowed to assert and argue a justification defense as defined by statute before the 2017 amendments, and the jury instructions properly informed the jury of the law on justification in effect at the time of the shooting.  We find the district court did not abuse its discretion in refusing to poll the jury or grant a mistrial based upon the Las Vegas shooting.  The district court also did not abuse its discretion when responding to the jury's question with directions to reread the instructions.  We find no prosecutorial misconduct.  Finally, we find the verdicts are supported by substantial evidence.

**AFFIRMED.**