# IN THE COURT OF APPEALS OF IOWA

No. 19-1754
Filed June 16, 2021

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**WILLIAM EDGAR BURTON, III,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Polk County, William P. Kelly, Judge.

William Burton III appeals his conviction for second-degree murder.

**AFFIRMED.**

Jamie Hunter of Dickey, Campbell & Sahag Law Firm, PLC, Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Zachary Miller, Assistant Attorney General, for appellee.

Heard by Bower, C.J., and Tabor and Ahlers, JJ.

**BOWER, Chief Judge.**

William Burton shot and killed Cory Channon in Channon's home. Burton was charged with first-degree murder and convicted of the lesser-included offense of second-degree murder following a jury trial. On appeal, Burton contends the trial court erred in denying his motion for mistrial and abused its discretion in its rulings on the evidence, denying his motion for judgment of acquittal, and improperly instructing the jury that malice aforethought may be inferred from the use of a dangerous weapon. We affirm.

**I. Background Facts and Proceedings.**

On January 9, 2018, Burton demanded Channon return a handgun he claimed Channon had stolen from him. Channon refused. Over several hours, the two exchanged text messages that became increasingly profane and threatening. Although Burton deleted all text messages from his phone, officers were able to retrieve the exchange from Channon's phone. Burton's texts included: "the way your [sic] doing this is not going to end up very well for either of us" and "No you fucked up bitch I'll shoot you from half a mile away."

At about 9:45 p.m., Burton's girlfriend, Crystal Purdy, started to send messages to Channon, falsely claiming Burton had thrown her out of the house and complaining about Burton. Channon invited her to come to his place. At about 11:00 p.m., Purdy messaged, "I'm almost there I'll be there in a second" and asked where she could park so Burton couldn't see her vehicle.

In the meantime, Burton retrieved another handgun, and he, Purdy, and James Dawson[1] (their neighbor) drove to Channon's residence. On the way over, Burton told Purdy "[s]omeone is going to die tonight." Purdy dropped Burton and Dawson off a few houses away and then drove to Channon's residence. Channon met her outside and invited her inside his apartment.[2] The two talked and smoked a cigarette. Burton entered the apartment, slamming the screen door shut. He had a handgun at his side and demanded Channon return his handgun. As Channon began to stand up, Burton raised his handgun and with its laser sight activated shot Channon. Channon fell back onto the couch. Burton, Purdy, and Dawson then drove away.

Channon's neighbors heard yelling in Channon's apartment and the gun shot. They called 911. Officers arrived minutes later and found Channon unresponsive.

Forty-five minutes after the shooting, Burton called police and reported he had been involved in a shooting. He said he would await officers in the parking lot of a convenience store. When Burton was picked up, he told officers he left the gun involved on a chair in his apartment.

Burton was taken into custody and was interviewed by two detectives. Burton told them Channon stole his handgun so he went to retrieve it. He said Purdy went to Channon's to try to calm Channon and Channon would not know

---

[1] Purdy testified Dawson was along "[t]o be muscle in case anything went bad."
[2] Purdy stated this was not the original plan, which was "he was going to walk me up to the apartment, and then . . . [Burton] and [Dawson] were going to come up and talk to him about the gun."

Burton was coming. Burton said when he got to Channon's, Channon nodded him in. Burton asked for his gun. When Channon got up, Burton said he feared for his life so he shot Channon. He did not call for help afterward because he panicked. When asked about the text messages he sent Channon, Burton first said his phone deleted texts every hour. Later, he admitted he had deleted them.

Following an autopsy, a forensic pathologist determined the bullet fired from Burton's gun traveled through Channon's left shoulder, fractured the scapula, went through the brachial plexus, the left upper lobe of the lung, the pericardial sac, pulmonary artery, right atrium, the aorta, the liver, and then was stopped by the skin below the rib cage. Forensic testing showed Burton fired from above Channon, indicating that Channon was bent over at the time.

Burton and Purdy were both charged with murder. Purdy entered into a plea agreement and testified at Burton's trial.

Burton asserted a justification defense,[3] arguing Iowa's recently amended Iowa Code section 704.1 offered additional protection.[4] He claimed he had a permit to carry a concealed weapon and, when Channon "charged" at him, he reasonably feared for his life and shot Channon in self-defense.

---

[3] Iowa Code section 704.3 (2018) provides: "A person is justified in the use of reasonable force when the person reasonably believes that such force is necessary to defend oneself or another from any actual or imminent use of unlawful force."

[4] Section 704.1 provides, "A person who is not engaged in illegal activity has no duty to retreat from any place where the person is lawfully present before using force."

Two central issues at trial were whether Burton was "a person who was not engaged in illegal activity" and if his use of force was justified. Before opening statements, the parties discussed motions in limine. The State informed the court:

> But if the defendant relies on this permit as some type of explanation for having these guns, I've shared with the defense what information I've gleaned regarding the defendant's criminal history. I think that raises a whole lot of red flags.
> Just briefly, to the court, it would suggest that the defendant, in four applications for permits to acquire and his permit to carry concealed weapons, committed perjury and lied and said that he wasn't an active drug user.

Burton's interview with police was played for the jury during trial. In the interview, Burton was asked if he had used methamphetamine the morning before the shooting. He denied using that day but stated he had been around meth at Channon's earlier in the day. When asked if police would find any drugs or paraphernalia when they searched Burton's home, he responded "everything should be thrown away" but acknowledged there was "probably going to be paraphernalia there."

Purdy testified her relationship with Burton involved methamphetamine use. She testified she used methamphetamine earlier in the day on January 9. She stated she had met Channon only three times before the shooting (the first time was about four days before), and she expressed concern to Burton because "I heard bad things about him, and asked [Burton] to get [Channon] out of the house." She testified the next time she met Channon there was also a woman at the house whose name she could not remember; Purdy stated she did not like that woman and asked Burton to get her out of the house. Purdy testified Burton had Channon give the woman a ride home in Burton's truck. The third time she met Channon

was at his apartment on January 9 in the chain of events resulting in Channon's death.

Purdy stated that before going to Channon's apartment, Burton had gone to the basement, presumably to get a gun. She also testified without objection:

> Q. Is there any other reason that Billy went down into the basement other than to do something with his gun? A. Yes, that's where he got high.
> Q. Okay. Was he down in the basement long enough to get high before you left the house? A. Yes.
> Q. Okay. So he comes up, you guys get in the truck, you drive over there, and Billy says, "Someone is going to die tonight." Do you drop them off as you guys had planned? A. Yes.

Purdy testified she entered Channon's apartment and they smoked a cigarette and talked.

> Q. And as you're sitting on that couch facing Cory—I should ask: Are you facing Cory? A. Yes.
> Q. So how are you positioned to the door? A. My back is towards the door.
> Q. How is Cory positioned to the door? A. Right in front of the door.
> Q. So as you're sitting there talking, at some point does Billy finally get there? A. Yes.
> Q. And how do you know Billy gets there? A. Well, I heard the screen door—the screen door slam shut, and I heard Billy asked Cory where his gun was.
> . . . .
> Q. And how does Cory respond? A. He says, "I don't have your gun, Billy."
> . . . .
> Q. As far as you know, Billy still believes that Cory has that gun? A. Yes.
> Q. And as far as you know, Cory stole the gun? A. Yes.
> Q. And what other conversation do you hear, or what else do you hear Billy say? A. He asked where his gun was, and I turned around and Billy had a gun. And Cory says, "What are you going to do? Shoot me?"
> Q. Where was Billy's gun? You said, "I turned around and looked and Billy had a gun." Where was it? A. In front of him.
> Q. Was he pointing it at somebody? A. Yeah.
> Q. Who was he pointing at? A. Cory.

Q. And Cory says, "What are you going to do? Shoot me?"
A. Yes.

Q. What does Billy do? A. Shot him.

The State called Mikayla Croy, but Burton moved to prevent her from testifying, asserting her testimony would consist of prior-bad-acts evidence and was unduly prejudicial and irrelevant. The State responded, in part:

[PROSECUTOR]: . . . Had there not been a discussion about the permit, like I brought to . . . everyone's attention before opening statements, we would not be having this conversation.

The defendant is the one that's trying to bolster his credibility and character by referencing a concealed-carry permit, period. He obtained it in a fraudulent way. He lied and committed perjury. I have the documents here.

This is the bed the defendant made. This should be no surprise to him now. That's why we spent such a long time making a record with him before opening statements.

I can see how it would factor into the stand-your-ground argument regarding whether or not he was doing—committing an illegal act, which would—then stand your ground wouldn't apply to him.

THE COURT: Well, that's why I thought we're going to have that as a fact question for the jury, because I do think when we have 704.3, "A person who is not engaged in illegal activity has no duty to retreat from any place where the person is lawfully present before using force."

And I thought that's what you were getting at in terms of—if he's under the influence of a controlled substance, with a firearm, in somebody's house, I thought that was the attack on the justification defense.

[PROSECUTOR]: Well, it can be that too, Your Honor. There are multiple crimes he was committing before he used illegal force and so, yes, there are fact questions for the jury.

THE COURT: [Defense counsel], once again, I will give you the last comment.

[DEFENSE COUNSEL]: And, Your Honor, whether he was there legally or not, that's a fact question. I don't think there's any doubt about that. That has to go to the jury.

THE COURT: So would his meth use, then, impact whether he was there legally?

[DEFENSE COUNSEL]: I don't know. That's a question for the jury, okay. If they say no, the fact that you used meth means you didn't have a permit to carry or that you were there illegally is for the jury, Your Honor.

THE COURT: Very good.  Will the State call their next witness, please.

Croy testified Burton had let her stay in his house for a few weeks prior to Channon's death because she was homeless.  She stated Burton's house was a "trap house,"[5] she used methamphetamine at Burton's house with Burton, and she knew Channon because he came to Burton's house three times and "we all used [meth] together."  She was not concerned for her safety in Channon's presence, and when he used meth he "talked faster and talked a lot more" but otherwise his demeanor changed little.  She stated Burton was "very aggressive" when he used.  She also testified she saw Burton with a gun and "he would always show it off and wave it around to people."  The prosecutor asked, "Now would he be doing this while he was using methamphetamine?"  Croy responded, "Yes, when he was under the influence of it."

Croy testified the last day she was at Burton's house was the day before Channon died.  She stated she and Burton had left the house together and when they returned Purdy and Channon were there.  Purdy "was running around screaming at me, telling me that I needed to get out."  She testified Burton told Channon to take his truck and give her a ride.  Channon drove Croy to his house.

Burton elected to testify in his own defense, and his counsel informed the court they intended to explore Channon's reputation for violence and Burton's understanding of Channon's violent nature.  Prior to Burton's testimony, the court ruled:

---

[5] According to Croy, a trap house refers to "a place where people go to use and buy drugs."

THE COURT: All right. So all of my rulings so far have been in an attempt to comply with *State v. Williams*, which is an Iowa Supreme Court case, 929 N.W.2d 621 [(2019)].

In that case they were dealing with character evidence. And my rulings have dealt with the idea that because of the defendant's prior relationship with the victim, because of their drug use together, because of their knowledge of each other, I was allowing my evidentiary rulings to reflect the *State v. Williams*' rationale, that "a defendant asserting self-defense or justification may not prove the victim's aggressive or violent character by specific conduct of the victim unless the conduct was previously known to the defendant."

. . . .

The hearsay rules just don't really apply in this case, I think, because [Burton's] knowledge of [Channon's] reputation goes towards his reasonable belief in using force. So the fact that he knew he was in prison, I don't think implies a violent or aggressive nature. In fact, we know that he was in prison for drug use. So maybe we need to ask again: What are the facts that the defendant would discuss in regards to whether the victim was violent or aggressive? And I think the State should be allowed to ask on that.

Does that make sense? Because the whole reason we're talking about this, is how we apply stand your ground, which eliminates any duty to retreat before using force if one is not engaged in illegal activity.

And I think that's why you talked about the permit being important. I think that's why the State probably gets to talk about— that using that permit might not have been legal if he was in fact using or not in compliance with federal law as we've discussed.

Burton testified about his knowledge of firearms and his permit to carry. He testified he "always carried" a gun on his person. Burton testified he had suffered a back injury at work and was receiving disability benefits and takes medication for back pain. He stated he had known Channon for many years and Channon knew of his back injury. Burton testified he was five feet, five inches tall and "severely overweight." Burton denied being a regular user of methamphetamine but admitted he "used a few times." He testified:

Q. What do you do next after you are out of the truck? A. Me and James, we start walking towards the house to see if Crystal got it. I get up to the screen door and the main door is open. The screen

door is a glass door. Crystal is sitting on the couch, and Cory is sitting on the love seat, facing me.

Q. What happens next? A. He nods and tells me to come in.

Q. What do you mean he nods and he tells you to come in? A. Well, he recognized that I was there and nodding, meaning come in.

Q. So tell the jury how he nods you in. A. (The witness complies.)

Q. What happens next? A. I walk through the screen door and he says, "What up, Billy?" A. I said, "Cory, just give me back my gun and everything is fine. We'll swatch everything and be all good again."

Q. What happens next? A. He scoots to the edge of the couch, to the edge of the love seat. And at this point I—I'm scared. So I click on the laser and show that I have force. And he says, "What are you doing with a pistol?" and lunges at me. At this point— at this point I draw up and it goes off.

Q. What goes off? A. The gun.

Q. What happens next? A. He stands up and goes over to the couch. He sits back down on the couch and says, "Don't shoot. Don't shoot." And I—Crystal is running out of the house at this point. And I yell at him, "Damn it, Cory," and then I followed Crystal.

Q. You leave? A. I leave.

Q. What's your state of mind? A. I'm freaking out.

Q. What did you think Cory was doing when he came off the couch? A. I thought he was coming to kill me.

Q. How did he come off the couch? A. With his left shoulder and head down, coming straight at me.

Burton explained, "His whole demeanor said he had a gun."

At the close of the State's case and the defense, Burton moved for judgment of acquittal, arguing the State failed to prove malice aforethought and lack of justification. The district court denied the motions.

Burton objected to the court's proposed instruction allowing the inference of the malice aforethought from his use of a dangerous weapon, arguing the changes in law means the mere carrying of or using a weapon in self-defense cannot be used to infer malice. The court rejected the argument and included the instruction.

During jury deliberations, the jury foreperson brought a piece of paper to a court attendant that had been found folded up on a table in the jury room. The court briefly questioned the jury foreperson about the paper[6] outside the presence of Burton or his attorneys and told her to disregard it.

The court alerted the parties. Burton moved for a mistrial, arguing the paper amounted to juror misconduct. While the parties and the court discussed what to do, the jury reached a verdict. Before accepting the verdict, the parties agreed on questions to ask each juror. One by one, the court questioned each juror in the presence of all parties. Those questions revealed the jury foreperson had held the paper up and asked if it belonged to any of the other jurors, the foreperson and a juror sitting next to her had briefly viewed the paper, and no juror saw Burton's name on the paper. The district court denied the motion for mistrial.

The verdict was then received. The jury found Burton guilty of the lesser-included offense of murder in the second degree. The court sentenced him to an indeterminate term of fifty years with a thirty-five-year mandatory minimum.[7]

Burton now appeals. He asserts (1) the court erred in denying his motion for mistrial based on juror misconduct, (2) the court abused its discretion in admitting three irrelevant and unduly prejudicial photos of Burton's home, (3) the court abused its discretion in allowing Croy to testify, (4) by limiting Burton's

---

[6] The paper appeared to be related to the criminal charges against and security measures for those in custody. Burton's name was the twenty-fifth of twenty-eight names on one side of the paper; Burton is the thirty-seventh of forty names on the other side.

[7] The sentence was to run consecutive to a ten-year sentence on a conviction for robbery in the second degree. *See State v. Burton*, No. 19-1417, 2021 WL 1904650 (Iowa Ct. App. May 12, 2021).

testimony about Channon's violent prior acts, the court denied him the right to adequately present his defense, (5) there is insufficient evidence to support the verdict, and (6) the court erred in instructing the jury it could infer malice aforethought from use of a dangerous weapon.

## II. Scope and Standards of Review.

We review the denial of a motion for mistrial for an abuse of discretion.[8] *State v. Gathercole*, 877 N.W.2d 421, 427 (Iowa 2016). So, too, evidentiary rulings are reviewed for an abuse of discretion. *State v. Dessinger*, 958 N.W.2d 590, 597 (Iowa 2021) ("District court decisions on whether to admit or exclude evidence are typically reviewed for an abuse of discretion."). "An abuse of discretion occurs when a district court exercises its discretion on grounds or for reasons clearly untenable or to an extent clearly unreasonable." *State v. Wilson*, 878 N.W.2d 203, 210–11 (Iowa 2016).

Constitutional issues are reviewed de novo. *Chistensen*, 929 N.W.2d at 676.

Challenges to the sufficiency of the evidence supporting a guilty verdict are reviewed for correction of errors at law. *State v. Benson*, 919 N.W.2d 237, 241 (Iowa 2018). We will uphold a verdict if supported by substantial evidence. *Id.*

## III. Discussion.

*A. Motion for Mistrial.*

During jury deliberations, the court convened with the attorneys and the defendant and made the following record:

---

[8] *But see State v. Christensen*, 929 N.W.2d 646, 676–77 (Iowa 2019) (discussed later in this opinion).

THE COURT: Shortly after [the jury sent out a question], my judicial assistant brought a folded-up piece of paper to me that was provided to her by the jury forewoman.

I opened up the piece of paper, and it is the Polk County Court List, which would have the inmate's name, their sex. The heading is "Jail Cell," "Deputy," "Courtroom," "Type," and then "Charges & Notes."

And it's a two-sided document. So on page 1 of the first page, it had, "Mercado Lopez, Hector." And then on the back side it had "Allen, Taquan," T-a-q-u-a-n.

So the juror was standing out in the hallway. I approached her and asked her where she found it. She said she found the folded piece of paper on the juror table, that she opened it up to figure out what it was, if it was evidence. She thought maybe it was an exhibit list to help them keep things in order.

She looked at it and saw Polk County Court List. And then she said once she realized it didn't have anything to do with the case, she handed it to the judicial assistant.

I asked her if she showed any of the other jurors; she said no. I asked her if she recognized anybody's—or if she recognized any names on the list; she said no. I asked her if she did anything with the list, and she said no and she refolded it back up and gave it to the judicial assistant.

I then told her—I said, "It is not evidence. It wasn't supposed to be in your jury room. And I'm just telling you: Disregard, don't talk about it with any of the other jurors. It's not evidence, and it's not part of anything you need to be considering, and thanks for bringing it our attention." So that's the way I left it with the juror.

Then I scanned it and sent it to counsel.

The court asked the court assistant to come in and explain who had brought the paper to her. The assistant stated the jury foreperson came to her desk with the paper:

It was folded up. She said something along the lines of: I found this, or we found this on the table and weren't sure what it was and just thought that I should bring it to you.

[PROSECUTOR]: So did—I understand the initial start of the conversation is probably pretty innocuous. Do you remember if she said "I" or "we"?

[JUDICIAL ASSISTANT]: So she then, after that, kind of clarified and said, "I saw it there yesterday. I thought it was [another juror]'s," who sits next to her. Then she said something about, "I thought it may have something to do with our exhibit list."

But it sounds like at that time she didn't do anything with it. Nobody touched it. Nobody had unfolded it until today when she kind of noticed it again and thought maybe it had something to do with the exhibits, because they were getting them all out of order.

So at that time I think she thought, maybe, to look at it. She first asked [the other juror] if it was his. He said no. She opened it, said she saw what it said right at the top, asked if it was anybody's. Did not pass it around or anything. Said out loud just what it said at the top, and then someone apparently said to her, "I don't think we're supposed to have this. You need to take it out of the room." And that's when she brought it to me.

The prosecutor asked the judicial assistant if the jury foreperson had said what she had seen. The judicial assistant replied, "She said something about 'Polk County.' And then I believe Judge Kelly said, "Did you see my name on there?" And she said, 'I saw the name Kelly, I think.'"

After further discussion, it was learned a county deputy had taken a break in the jury room on August 8 and had accidentally left the folded paper in the jury room that day. It was turned in by the jury foreperson on August 14. Further discussion was had as to whether a remedial instruction should be given to the jurors. The parties viewed the document. The prosecutor asserted,

And as I review the document, Judge, I don't recall there being any—there's no highlights. There's no significant information about Mr. Burton, the other person pertinent to this case, that's listed on there, as Crystal Purdy.

So it's the State's position, Judge, that with the information that we've been given, it is not prejudicial. It is not overly prejudicial. It is not—I mean, it's an unfortunate situation, but I don't believe it affects the course of the jury deliberations.

The defense disagreed and moved for a mistrial, stating:

Nobody wants to do this case again. The condition of that document makes it unclear to me which way it was originally folded, whether it's been folded in different directions, or not.

I believe next to Mr. Burton's name—if I may take a look at it again. I believe Mr. Burton's name appears on both sides of the document. In the furthest cell of one side, it says, ""X2 Murder 1st,

K/S Purdy, Crystal." It looks like it's times two, murder. It looks like he's facing two murder charges. I mean, possibly.

We go to great lengths, Your Honor, to make sure the jury doesn't know that my client is in custody. And this court list also says on it, "U.S. Marshals," not far below his name.

I think we have the concern that this could contaminate the members of the jury, whoever saw it, at least the jury foreperson. Whether she recognized in the moment when she was seeing it or comes to recognize it later, I think we've all had the experience where we see something and later it sort of flips a switch in our brain and we realize what we saw that we didn't take in initially, or didn't register.

I think it's too big of a risk to take. And there is significant prejudice to my client. We try very hard to control what the jurors are exposed to.

And by pure accident—and nobody is suggesting it's anything else—I think we're in a situation where we have failed in that regard and there's too much risk to Mr. Burton.

Later, defense counsel asked, "Your Honor, are we in a procedural difficulty with the court having spoken with the juror?" The parties discussed whether to question the jurors but before reaching a resolution the jury returned a verdict.

Prior to accepting the verdict, the court and counsel agreed to a number of questions to ask each juror individually:

Number one: "Since you've been in deliberations, did you notice a piece of paper in the room that did not belong?" If yes, "Are you aware of any of the contents of the document?" If yes, "Did you hear anyone else comment on the document and what, if anything, was said?" And "Whether anything they saw or heard about the paper affected their ability to base a verdict on the law and the instructions and the evidence at trial?"

After questioning the jurors, the court ruled:

THE COURT: The motion before the court is a motion for mistrial based on the fact that a Polk County Court List, listing the inmates, was left in the jury room.

The defense has argued that an impartial verdict cannot be reached because this document that was left in the jury room would be unfairly prejudicial to the defendant.

In reviewing the answers of the jurors, it appears that only the forewoman actually even had an opportunity to potentially look at the contents of the Polk County Court List.

When asked if she noticed anything about the content of the document or whether she was aware of any of that content that related to our trial, she did mention that she might have saw the "Kelly" name on there. She did not mention seeing Mr. Burton's.

The other juror, who she asked if it was his, said it wasn't his. And he noticed it—or he said it wasn't his because he didn't bring it in, and saw it when he walked in. And I don't believe he noticed any of the content of the document.

After talking to all [twelve] jurors, it appears that nothing that they saw or heard about that Polk County Court List impacted their ability to base a verdict on the law that they were given in the instructions and the evidence that they received in trial.

Having considered the defense's complaints in regards to the Polk County Court List that was left in the jury room and the possible effect on the jury's ability to return an impartial verdict, this court finds that leaving that piece of paper in the room, and the way the jurors handled that piece of paper, does not rise to the level of a denial of a fair trial for the defendant.

We could tell from the amount of jury questions that they were asking, that this jury appeared to take the instructions very seriously, were trying to read them quite carefully.

I think they did the right thing once they determined that this document was not a piece of evidence and did not act as a list for the orderly return of the exhibits.

It appears they got it to the judicial assistant, who then got it to the court, and then it was given to the attorneys as soon as the court received it.

I also think there's enough protections for the defendant, based on the jury instructions that were given to this group, specifically, number one, where they are to determine the evidence based—I'm sorry. They are to determine the defendant's guilt or innocence from the evidence and the law of these instructions.

Instruction No. 4, that talks about them making very important decisions and that they return a just verdict based solely on the evidence, your reason and common sense, and these instructions. Your sole duty is to find the truth and to do justice.

Also, in regards to Instruction No. 7, that the presumption of innocence requires the jury to put aside all suspicion which might arise from the arrest, charge, or the present situation of the defendant.

Instruction No. 8 specifically tells them that they are to determine the guilt—or determine the defendant's guilt or not guilty from the evidence and the law in these instructions.

> Based on the fact that I believe the jury has followed the instructions, immediately and promptly got rid of the document that was not evidence, and the fact that based on their answers that piece of paper did not impact their verdict, I find that the leaving of that piece of paper in the jury room does not rise to the level of a denial of a fair trial for Mr. Burton and, accordingly, the motion for mistrial is denied.

On appeal, Burton contends he was denied a fair trial before an impartial jury. He quotes our supreme court in a recent case: "The partiality of one juror due to extraneous influence is sufficient to deny the defendant the constitutional guarantee of an impartial trial." *See Christensen*, 929 N.W.2d at 661. The State asserts Burton made no constitutional challenge in his motion for mistrial and thus we are limited to reviewing whether a new trial is warranted under the Iowa Rules of Criminal Procedure—rule 2.24(2)(b)(2), which allows the court to grant a new trial "[w]hen the jury has received any evidence, paper or document out of court not authorized by the court," or rule 2.24(2)(b)(9), which allows a new trial "[w]hen from any other cause the defendant has not received a fair and impartial trial."

The motion for mistrial raised the general issue of an impartial jury—no rule or constitutional violation was specified. We recognize our supreme court has recently stated there is a question of the proper standard of review "[w]hen a party seeks a mistrial under our rules designed to ensure a fair trial, but does not mention any provision of the Iowa or United States Constitution." *Christensen*, 929 N.W.2d at 676. Like the court in *Christensen*, however, "we generally agree with the fact-finding of the district court. Therefore, the result in this case does not depend on the standard of review." *See id.* at 677–78.

We thus determine if Burton has shown "a reasonable probability that the verdict of the jury would have been different if the extraneous influence did not

reach the jury in this case." *Id.* at 679. We conclude Burton has failed to make such a showing. As noted by the district court, only the foreperson had a chance to see the court list, and she did not see Burton's name on it. No other juror saw the contents of the court list or Burton's name.

Burton maintains in denying his motion for mistrial, the court improperly relied on the jurors' testimony that they were able to return an impartial verdict. We simply note that the parties agreed to the questions the jurors were to be asked. The defense may not now complain those questions were improper.

In any event, we are not convinced the court relied upon the jurors' response to the question "Whether anything they saw or heard about the paper affected their ability to base a verdict on the law and the instructions and the evidence at trial?" Rather, the court considered objective facts about who saw what and who said what to whom. *See id.* at 679 ("What can be considered is objective facts—who said what to whom and when and what specifically was injected into the jury discussion. But juror assessments about the impact of the improper extraneous influence are off limits."); *see also Gathercole*, 877 N.W.2d at 433 ("Although the district court did not abuse its discretion in this case, we encourage courts to resolve doubts about whether information published midtrial requires a poll requested by a party in favor of granting a poll. Although one court has suggested a jury poll during a trial might be less than a perfect means of discerning the nature and extent of prejudice, if any, resulting from factually inaccurate midtrial publicity, 'it at least gives some suggestion as to whether the verdict was tainted with improper consideration and improper influences.'" (citations omitted)).

With respect to his complaint about the court's ex parte questioning of the forewoman,[9] we are not persuaded defense counsel's statement—"Your Honor, are we in a procedural difficulty with the court having spoken with the juror?"—is sufficient to preserve any claim of error for our review. *See Meier v Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal."); *see also Taft v. Iowa Dist. Ct.*, 828 N.W.2d 309, 322 (Iowa 2013) ("Even issues implicating constitutional rights must be presented to and ruled upon by the district court in order to preserve error for appeal.").

*B. Admission of Photographs.*

Burton contends the court abused its discretion in admitting photographs in State's exhibits 47, 54, and 55 because they were unrelated to the shooting. He also asserts one photo including a sign in his home that read "Fuck Cops" was unduly prejudicial. He contends prejudice arising from exhibit 47, which included the sign's "inflammatory language," far outweighed any relevance. As for exhibits 54 and 55, he contends the photos showing his messy basement and including a video surveillance monitor amidst the tools and wires were the State's "attempt to make him look 'odd'" and constituted improper character evidence. The State

---

[9] Burton asserts:
> "[P]rivate conversations between the trial court and jurors are universally condemned." *State v. Cowman,* 212 N.W.2d 420, 424 (Iowa 1973). The court reporter did not make a record of the court's conversation with the foreperson that took place outside the presence of Burton and his counsel. A defendant has a constitutionally protected right to be present whenever the court communicates with a juror as to his impartiality. *State v. Blackwell,* 238 N.W.2d 131, 134–36 (Iowa 1976).

asserts the photos show the view inside Burton's house when the police entered and attempted to find the gun they were sent to retrieve and the State is allowed to set the scene.

Relevant evidence is admissible. *See* Iowa R. Evid. 5.402. Evidence is relevant if "it has any tendency to make a fact [of consequence] more or less probable than it would be without the evidence." Iowa R. Evid. 5.401. We are hard pressed to find the photographs were relevant to any issue in this case. Police found Burton's gun where he told them they would find it in his home. The shooting did not occur in Burton's home. Ballistics matched Burton's gun to the shot that killed Channon. Irrelevant evidence is not admissible.

However, especially in light of the overwhelming evidence of Burton's guilt, we conclude any error in admitting the photographs did not prejudice the defendant. *See State v. Neiderbach*, 837 N.W.2d 180, 205 (Iowa 2013) ("Nevertheless, '[w]e only find reversible error when the admission of improper evidence affects a party's substantial rights.'" (citation omitted)); *State v. Williams*, 574 N.W.2d 293, 298 (Iowa 1998) ("Not all errors require reversal. To warrant reversal the error must have prejudiced the defendant."); *State v. Traywick*, 468 N.W.2d 452, 454–55 (Iowa 1991) ("When an alleged error is not of constitutional magnitude, 'the test of prejudice [for harmless error purposes] is whether it sufficiently appears that the rights of the complaining party have been injuriously affected or that the party has suffered a miscarriage of justice.'" (alteration in original) (citation omitted)).

Burton admits going armed to Channon's home to retrieve another handgun. He was accompanied by Dawson, whom Purdy described as there to

provide "muscle" and whose presence Burton explained in his statement to police was because Burton "didn't want trouble." Burton walked into Channon's apartment with his gun out and visible to let Channon know he "ha[d] force." As Channon rose from a seated position, Burton shot him. The admission of the photographs here does not require a new trial in this case.

*C. Croy's Testimony.*

Burton contends the court abused its discretion by allowing Croy to testify, asserting

> Croy was not around for the day of the shooting—she had moved out the day prior because Crystal Purdy had wanted her gone. Burton's drug use, especially the manner of ingestion, was not probative as to whether Burton was defending himself at the home of Cory Channon. Burton testified that he did not use methamphetamine on January 9, the day of the shooting, and there was no evidence that he had used that day.

He contends "[h]er testimony was rife with prior bad acts that had little probative value which was significantly outweighed by its prejudicial effect." We will not address this broad-ranging claim of error. The district court did not allow a standing objection to Croy's testimony. As a court of review, we are confined to those issues properly raised and decided by the trial court. *See Senecaut*, 641 N.W.2d at 537.

Here, the defense objected to Croy's testimony three times. The first was when Croy described that living at Burton's house "was kind of crazy. It was a trap house, so . . . ." The next objection came when the State asked Croy, "How frequently would you ingest methamphetamine?" and Croy responded, "Multiple times a day." Finally, the third objection came when the State asked, "What was Mr. Burton like when he was under the influence of methamphetamine?" Croy answered, "Aggressive."

Our supreme court has quite recently outlined the general principles of prior-bad-acts evidence. *State v. Goodson*, 958 N.W.2d 791, 799–800 (Iowa 2021).

> The admission of the evidence is governed by Iowa Rule of Evidence 5.404(b)(1). Under the rule, "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." The rule further provides, however, that prior acts "evidence may be admissible for another purpose such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* r. 5.404(b)(2).
> We have analyzed the admissibility of prior acts evidence using a three-step approach. In [*State v.*] *Richards*, we summarized the three-step approach:
>> (1) "the evidence must be relevant and material to a legitimate issue in the case other than a general propensity to commit wrongful acts"; (2) "there must be clear proof the individual against whom the evidence is offered committed the bad act or crime"; and (3) if the first two prongs are satisfied, "the court must then decide if [the evidence's] probative value is substantially outweighed by the danger of unfair prejudice to the defendant."
>
> 879 N.W.2d [140,] 145 [Iowa (2016)] (alteration in original) [(citation omitted)].

*Id.* (first alteration in original).

Our discussion must begin with the acknowledgement there was already admitted evidence about Burton's and Purdy's drug use. Burton's interview with police discussed drug usage, and he told them he was around methamphetamine earlier in the day at Channon's. Purdy testified her lifestyle was "[d]rugs" during the time leading up to Channon's death. Purdy testified without objection that she had Burton were using methamphetamine from 2012 through January 2018 and that most of their relationship involved drugs. She testified she used drugs on January 9.

Burton asserts, "Even if Croy's testimony was marginally relevant, it was cumulative." Under these circumstances, Burton has not shown how Croy's testimony unfairly prejudiced him.

Burton generally asserts Croy's testimony that Burton was aggressive under the influence of methamphetamine was "improper character evidence" because the State offered no evidence Burton was under the influence on the date of the shooting. The State responds it offered evidence Burton used drugs for years, including daily in the month before the murder. Purdy testified he was in the basement—a part of the house where Burton was known to use drugs—long enough to get high right before leaving to go to Channon's apartment, and Burton told police he was around meth in the morning the day he killed Channon. The State contends the evidence was sufficient for the jury to find Burton used methamphetamine before leaving for Channon's and his tendency to act aggressively when using methamphetamine was probative evidence rebutting his claim he was justified in shooting Channon. We agree the State presented sufficient evidence Burton's aggressiveness under the influence was admissible for the purpose of intent, motive, absence of mistake, or lack of accident. The trial court was faced with new legislation and carefully considered Burton's reliance on his claim he was "[a] person who [was] not engaged in illegal activity" with no duty to retreat, as well as the State's burden in showing Burton was not justified in shooting Channon. We find no abuse of discretion by the trial court here.

*D. Inability to Present His Defense.*

Burton contends the court erred in not admitting a photograph of a second bullet removed from Channon's body during the autopsy or allowing testimony

regarding specific instances of Channon's violence. He asserts he was thereby denied his constitutional right to present a defense. This constitutional claim was not made below and is not properly before us.

The question presented is whether the trial court's evidentiary rulings violated Iowa Rule of Evidence 5.405(b), which provides:

> (a) *By reputation or opinion.* When evidence of a person's character or character trait is admissible, it may be proved by testimony about the person's reputation or by testimony in the form of an opinion. On cross-examination of the character witness, the court may allow an inquiry into relevant specific instances of the person's conduct.
> (b) *By specific instances of conduct.* When a person's character or character trait is an essential element of a charge, claim, or defense, the character or trait may also be proved by relevant specific instances of the person's conduct.

"[I]f the accused asserts he or she acted in self-defense, specific instances of the victim's conduct may be used to demonstrate his or her violent or turbulent character." *Williams*, 929 N.W.2d at 635 (citation omitted). The text of rule 5.405(b) "allows specific-acts evidence to be used to prove character only when character is an 'essential element' of a charge, claim, or defense." *Id.* The *Williams* court stated, "Character is not an essential element of justification." *Id.* at 636. The *Williams* court held, "[A] defendant asserting self-defense or justification may not prove the victim's aggressive or violent character by specific conduct of the victim *unless* the conduct was previously known to the defendant." *Id.* That is, specific acts of a violent character are not admissible unless the victim had actual knowledge of the other person's prior acts of violence. *Id.*; *see also Klaes v. Scholl*, 375 N.W.2d 671, 676 (Iowa 1985) ("We believe, however, that in cases like this one the 'issue' in question is not one of *character* but rather of *conduct.*

We hold therefore the evidence of Scholl's prior conduct did not go to an essential element of self-defense as required by rule [5.]405(b) and was not admissible. We note that we are not dealing with the special situation in which the person claiming self defense had actual knowledge of the other person's prior acts of violence. We intimate no opinion as to that situation." (internal citations omitted)).

Burton contends to adequately present his defense of justification and why he feared for his safety in his confrontation with Channon he should have been allowed to prove Channon had been shot in the past and Burton had heard he had been physically violent in domestic relationships. Burton asserts the fact Channon had another bullet in his body at the time of his death proves "Channon had previously been in a gunfight." This statement is a non sequitur—being shot certainly does not equate with being in a gunfight. More fundamentally, Burton did not know until the autopsy that Channon had been shot previously. The fact had no bearing on whether Burton reasonably feared for his safety in Channon's presence at the time of the shooting.

Burton states he should have been able to testify Channon "bragged" to him about having a record that included domestic abuse, domestic assault, eluding police, and a high-speed chase. Burton, however, has no actual knowledge of this purported conduct: he only states Channon told him. None of the proposed testimony falls within allowable evidence under Iowa Rules of Evidence 5.405. The trial court properly analyzed the proposed testimony under the *Williams* holding, and we find no error.

*E. Sufficiency of the Evidence and Malice-Aforethought Instruction.*

Burton next contends the State did not meet its burden to prove Burton acted with malice aforethought and without justification to support a conviction of second-degree murder. This contention is interwoven with his claim the jury instruction allowing an inference of malice aforethought improperly shifted the burden of proof from the State to Burton.

The jury received a number of instructions pertinent to the charge of second-degree murder and the justification defense, and the instructions clearly place the burden of proof on the State:

**INSTRUCTION NO. 31**

The State must prove all of the following elements of Murder in the Second Degree:

1. On or about the 9th day of January, 2018, the defendant shot Cory Channon.

2. Cory Channon died as a result of being shot.

3. The defendant acted with malice aforethought.

*4. Defendant acted without justification.*

If the State has proved all of the elements, the defendant is guilty of Murder in The Second Degree. If the State has failed to prove any one of the elements, the defendant is not guilty of Murder in The Second Degree . . . .

(Emphasis added.)

**INSTRUCTION NO. 48**

The Defendant claims he acted with "justification." A person is "justified" in the use of reasonable force when the person reasonably believes that such force is necessary to defend oneself from any actual or imminent use of unlawful force.

The State must prove at least one of the following elements to show that Defendant was not justified:

1. The Defendant provoked the use of force against himself with the intent to use such force as an excuse to inflict injury on the other person.

2. The Defendant did not believe he was in imminent danger of death or injury and the use of force was not necessary to save him.

3. The Defendant did not have reasonable grounds for the belief.

4. The force used by the Defendant was unreasonable.

> *The State has the burden to prove the Defendant was not acting with justification.*

(Emphasis added.) The instructions went on to explain each of the four alternatives. The instructions here correctly stated the law and did not improperly shift the burden of proof.

The jury was also instructed as to the definition of malice and malice aforethought: "[m]alice aforethought may be inferred from the use of a dangerous weapon." Burton claims this instruction was improper because he used a dangerous weapon out of justified fear.

"If unjustified and unexcused, causing physical harm or death is a wrongful act, and therefore the intent to do these things is a state of mind that would constitute malice aforethought." *State v. Green*, 896 N.W.2d 770, 780 (Iowa 2017). "Thus, the jury may infer the defendant acted with malice aforethought by using a dangerous weapon, the natural consequence of which is physical harm or death." *Id.* The *Green* court further explained,

> [T]he defendant may argue the inference is improper because, even though the weapon was deadly, and even though the defendant intended the foreseeable consequences of using it, the defendant had adequate provocation or fear of imminent bodily harm to use the weapon. The inference would be inappropriate because the defendant's state of mind was not malicious, but instead was justified or excused. Green asserts the inference was inappropriate in his case based on the last of these examples; he argues the evidence did not show he committed the homicide with malice because he did not bring the weapon to the encounter and he was acting in self-defense. Essentially, Green challenges the jury instruction in this case by asserting there was not substantial evidence to support it.

*Id.* at 781 (internal citations omitted).

Burton claims the evidence shows Channon invited him into the apartment and Burton "[c]almly asked Channon to give him back his gun," but Channon

"lunged" at him with his right arm behind his back and he believed Channon was armed. Burton contends this shows he had a reasonable belief the use of force was reasonable and necessary.

Burton fails to mention the many texts he sent to Channon earlier in the day, including Burton's threats to "shoot you from half a mile away" and "the last thing you'll watch is me pissing on your head." Nor does he mention that he and Purdy planned to distract Channon so he would not be aware Burton was there with "muscle," or that he had been at Channon's twice earlier in the day and expressed no fear of Channon. He ignores the testimony from the neighbor that he heard shouting just before the gun shot. Purdy testified Burton was armed and angry when they drove to Channon's to retrieve Burton's gun. Burton also omits the fact when he entered Channon's apartment he was already holding his handgun at his side so Channon could see it. Purdy testified Channon did not display any aggressive behavior toward Burton.

Here, there was substantial evidence Burton "acted with malice aforethought," that is, with "a fixed purpose or design to do some physical harm." As was the case in *Green*, we conclude the court properly instructed the jury it could infer Burton acted with malice aforethought from his use of a dangerous weapon.

> [I]f the jury rejected [Burton's] self-defense argument, it could, but was not required to, infer [Burton] acted with malice aforethought from his use of a dangerous weapon. Later instructions explained [Burton's] justification defense and the State's burden to overcome it. Moreover, the jury was instructed it could only find [Burton] guilty of second-degree murder if it found the State proved he lacked justification.

*See id.*

We will uphold the verdict if it is supported by substantial evidence. *See Benson*, 919 N.W.2d at 241. Evidence is substantial if, when viewed in the light most favorable to the State, it could convince a rational factfinder the defendant is guilty beyond a reasonable doubt. *See id.* Viewing the evidence in the light most favorable to the State and giving the proper deference to the jury's findings of fact and determination of witness credibility, there is substantial evidence Burton acted with malice aforethought and without justification when he shot and killed Channon.

## IV. Conclusion.

Having reviewed the alleged errors properly preserved, we conclude Burton has failed to show "a reasonable probability that the verdict of the jury would have been different" had the paper not be found in the jury room, and therefore, the court did not err in denying the motion for mistrial. The court's evidentiary rulings either were not an abuse of discretion or did not result in prejudice to the defendant. The evidence supported the jury instruction allowing an inference of malice aforethought from the use of dangerous weapon, and substantial evidence supports the conviction of second-degree murder. We therefore affirm.

**AFFIRMED.**